645 F.2d 183
 25 Fair Empl.Prac.Cas. 774,
25 Empl. Prac. Dec. P 31,636
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellee,
v.
FORD MOTOR COMPANY, Appellant.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellant,
v.
FORD MOTOR COMPANY, Appellee.
 Nos. 79-1515, 79-1516.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 2, 1980.
Decided March 19, 1981.
 
 John R. Wester and Richard A. Vinroot, Charlotte, N. C. (Fleming, Robinson, Bradshaw & Hinson, P. A., Charlotte, N. C., on brief), for appellant.
 Vince J. Blackwood, Equal Employment Opportunity Commission, Washington, D. C. (Leroy D. Clark, Gen. Counsel, Joseph T. Eddins, Associate Counsel, Beatrice Rosenberg, Asst. Gen. Counsel, Equal Employment Opportunity Commission, Washington, D. C., on brief), for appellee.
 Before WINTER and BUTZNER, Circuit Judges, and HOFFMAN*, Senior District Judge.
 WINTER, Circuit Judge:
 
 
 1
 The Equal Employment Opportunity Commission (EEOC) brought suit against Ford Motor Company for violating Title VII, 42 U.S.C. § 2000e-2. EEOC alleged that Ford had discriminated against several women in its hiring practices at a parts warehouse in Charlotte, North Carolina. The district court found that Ford had discriminated against ten individual women and awarded them back pay. We affirm, but remand the case to the district court for consideration of additional relief.
 
 I.
 
 2
 Ford operates a parts warehouse in Charlotte. A number of the workers at the warehouse are "picker-packers." These employees fill orders for automotive parts by "picking" out ordered parts from storage and "packing" them for delivery. Until 1972 when two women were hired as temporary workers, no woman had ever worked as a picker-packer at the warehouse. Ford did not hire a woman to work as a picker-packer on a permanent basis until 1975.
 
 
 3
 In 1971, Judy Gaddis applied for employment as a picker-packer at the warehouse. When she did not receive a job, she filed a sex discrimination charge with the EEOC. The EEOC, after unsuccessfully trying to secure an acceptable conciliation agreement, sued Ford under Title VII on behalf of two groups of women. The first group consisted of Gaddis and two others who applied for picker-packer jobs which Ford filled with men in the summer of 1971. The second group consisted of eleven women who applied for a single picker-packer opening in 1973. Again in 1973 Ford had chosen a man, not a woman, to work at the warehouse.
 
 
 4
 The 1971 woman applicants were Gaddis, Rebecca Starr and Zettie Smith. In response to proof that as of 1971 it had never hired women as picker-packers and proof of a discriminatory hiring policy, Ford attempted to demonstrate that it had not in fact discriminated against women in its hiring practices at the Charlotte warehouse. Further, Ford tried to show that these particular women had not applied before the 1971 openings were filled. The district court rejected Ford's arguments, finding that Ford had followed a discriminatory hiring policy and that the three women had applied prior to the time in 1971 when Ford hired three men.
 
 
 5
 With the aid of a special master, the district court calculated the back pay due Gaddis, Starr, and Smith. Based upon the employment history of the three men who were hired in 1971,[1] the district court decided that, if the women had been hired in 1971, they would have worked at Ford until the time of trial. The special master thus began the back pay period with the date of the 1971 hirings and ended it at the date of trial in 1977.
 
 
 6
 With respect to Gaddis and Starr only, Ford attempted to terminate its back pay liability at three different junctures: in 1973 when they were recalled for one year by their former employer General Motors, later in 1973 when they rejected job offers from Ford, and in 1975 when they entered a CETA nurses training program. The district court refused to truncate the back pay periods at any of these points. Further, the district court rejected Ford's request to subtract unemployment compensation from the back pay awards.
 
 
 7
 In 1973, Ford filled a vacancy by hiring a man, Robert Simpson, even though eleven women had applied for the position. The district court ruled that EEOC proved a prima facie case of sex discrimination, in this instance based upon Ford's hiring procedures. After referral, the special master found that Simpson was hired in part because a warehouse employee took an interest in his application and that Ford did not seriously consider the applications of the eleven women. The special master determined that Ford did not intentionally discriminate against the women when it hired Simpson. But the special master concluded that Ford's practice of hiring new employees on the recommendation of present workers, who were all male, without giving other applications full consideration, had a discriminatory effect upon the women applicants. The district court accepted the conclusion of the special master.
 
 
 8
 Pursuant to the district court's instructions, the special master determined the back pay due each of the women who had applied for the 1973 opening. Smith was among the eleven who had applied, but she was not included in the 1973 group because her injury was remedied by the award she received as a member of the 1971 group. Of the remaining ten applicants, seven appeared before the special master and demonstrated their financial injury.[2] Under the district court's directions, the special master divided each woman's award by seven, since the seven women had applied for a single vacancy.
 
 
 9
 Ford attempted to reduce its back pay liability by arguing that the back pay periods of the seven women should terminate with the end of Simpson's employment at Ford. Simpson was laid off by Ford in 1974. He was not recalled; instead, Ford hired a woman, its first permanent female picker-packer, to fill his job. The special master found, however, that it was Ford's usual practice to recall employees who had been laid off. Therefore, the special master refused to end the back pay period with Simpson's termination, and the district court approved that decision.
 
 
 10
 The district court granted the two groups of women no additional relief beyond back pay. No mention of additional relief was made in the report of the special master, nor did the district court discuss other remedies in its findings of fact and conclusions of law, its referral order, or its final order.
 
 
 11
 Finally, the district court ordered Ford to report in the future about the company's efforts to hire women. The court declined however, to grant general prospective relief against sex discrimination at the warehouse, due to the vigorous affirmative action program Ford had pursued since 1975.
 
 II.
 
 12
 Because the 1971 openings and the 1973 opening involve different issues, we examine these two incidents of alleged discrimination separately.
 
 A. 1971 Openings
 
 13
 (1) Discrimination
 
 
 14
 (a) Prima Facie Case
 
 
 15
 Under Title VII, EEOC bore the burden of establishing a prima facie case that Ford discriminated against Smith, Gaddis, and Starr. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In this case, EEOC amply fulfilled its obligation.
 
 
 16
 EEOC showed that Ford had never hired a woman to work in its parts warehouse until 1972, when Gaddis and Starr were hired on a temporary basis, and that Ford hired its first woman permanent employee in 1975. In addition, Gaddis and Starr testified that when they applied in 1971 the receptionist told them that Ford did not hire women to work in the warehouse. Ford disputes this version of the facts and contends that the women were told that Ford "did not have females working (in the warehouse)." This version by itself supports an inference that Ford was discriminating on the basis of sex, but, in any event, the district court chose to believe the testimony of Gaddis and Starr. On these facts, the district court certainly made no clearly erroneous factual findings nor any improper legal determinations when it decided that EEOC established a prima facie case of sex discrimination by Ford against Gaddis, Starr, and Smith.
 
 
 17
 Once EEOC proved this prima facie case, Ford had the burden of proving a legitimate, nondiscriminatory reason for hiring the three men instead of Gaddis, Starr, and Smith. Board of Trustees of Keene State College v. Sweeney, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam); McDonnell Douglas. Ford argues that Gaddis, Starr, and Smith had not applied when it filled the three vacancies and that therefore they were not in reality victims of discrimination as a result of Ford's 1971 hiring decisions.
 
 
 18
 (b) Rebuttal: Gaddis and Starr
 
 
 19
 Ford insists that Gaddis and Starr applied a few days after the vacancies had been filled. Instead of Gaddis and Starr, Ford hired James Blanchard and Phillip Coe. Ford's employment records indicated that Blanchard was hired on August 5 and that Coe was hired on August 16. It is undisputed that Gaddis and Starr applied on July 21. Thus, it would appear that Gaddis and Starr applied before Blanchard and Coe were hired.
 
 
 20
 Ford's warehouse manager, however, testified that he thought that he hired the two men by phone before July 21, so that they could give their employers notice before joining Ford. The testimony of the two men themselves indicated otherwise. Coe testified that was hired "only just two or three weeks" before he went to work. Since Coe began work on August 16, according to his testimony he was hired no earlier than July 27, after Gaddis and Starr applied. Blanchard testified that he had been contacted by Miller "a week or two weeks" before he started his new job on August 5. He, then, was hired no earlier than July 23, also after Gaddis and Starr applied.
 
 
 21
 The district court, while noting that there was conflicting evidence, concluded that "(a)t least two of the men employed in August Coe and Blanchard were offered their jobs after Gaddis and Starr applied" (emphasis in original). Obviously, the district court compared the testimony of the warehouse manager with the testimony of Blanchard and Coe and found the recollections of Blanchard and Coe more persuasive. Credibility determinations are the province of the district judge, and, in light of this evidence, we do not find his conclusions clearly erroneous.[3]
 
 
 22
 (c) Rebuttal: Smith
 
 
 23
 Ford challenges Smith's recovery by contending that she did not apply at all during 1971. Smith had originally been considered only as one of the victims of possible discrimination in 1973, because she had applied for a warehouse job in 1973. Before the district court, however, Smith testified that she had also applied for a warehouse job in April and June of 1971. Smith said she applied in 1971 because early in that year her employer had warned its workers that, due to a change in plant ownership, their jobs might not be secure. Smith stated that she applied in April when she began searching for a new job, and in June, during her vacation.
 
 
 24
 Ford relies on the fact that it found no 1971 application from Smith in its files. Ford's records included only the 1973 application. The absence of a 1971 application carries little weight, however, because Ford routinely discarded applications after the passage of one year.
 
 
 25
 Further, Ford points to the testimony of its warehouse manager and its receptionist, who stated that Gaddis and Starr, who applied in July, were the first women applicants for warehouse jobs. But, in the face of Smith's testimony concerning her June application and her reasons for applying, the general recollections of the warehouse manager and the receptionist are not particularly persuasive. The district court, after observing all three witnesses, credited Smith's testimony. This credibility determination was for the district court and was not clearly erroneous.[4]
 
 
 26
 In addition to deciding that Smith applied in 1971, the district court concluded that "although she was qualified to be employed in the warehouse, her application was never seriously considered because she is a woman." Ford suggests that there is no evidence in the record to show that Smith's application was not considered. Contrary to Ford's position, there was sufficient evidence to support the decision of the district court.
 
 
 27
 EEOC showed that Ford never hired women as permanent employees until 1975 and that Gaddis and Starr had been told in 1971 that Ford did not hire women to work in the warehouse. Based on these two compelling pieces of proof, the district judge could reasonably infer that Smith's application, like the applications of Gaddis and Starr, did not receive serious consideration because of her sex. We cannot say that this factual determination was clearly erroneous.[5]
 
 
 28
 (2) Back Pay
 
 
 29
 In order to remedy the effects of discrimination against Gaddis, Starr, and Smith, the district court awarded them back pay. With the help of a special master, following the direction of this court in UTU v. Norfolk & Western Railway, 532 F.2d 336, 341 (4 Cir. 1975), cert. denied, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976), the court constructed the hypothetical work histories which the three women would have had at Ford if they had not been victims of discrimination. The court then used these hypothetical work histories to calculate back pay. The district court determined that if the women had been hired in 1971, they would have been working at Ford at the time of trial in 1977, as were two of the men who were hired in 1971. Accordingly, the court granted the women back pay from the time the men were hired in 1971 through 1977.
 
 
 30
 Ford urges that the back pay periods of Gaddis and Starr should have been terminated at three different points short of the date of trial. In addition, Ford insists that the awards of all three women should be reduced by the amount of unemployment compensation they received during the period.
 
 
 31
 (a) Subsequent Recall
 
 
 32
 Before Gaddis and Starr applied for the Ford warehouse jobs, they had worked in similar positions for General Motors. In 1971 Gaddis and Starr applied for work at the Ford warehouse because they had been laid off from their General Motors jobs. In January, 1973, Gaddis and Starr were recalled to General Motors. They worked at General Motors for approximately one year and were then laid off for a final time.
 
 
 33
 The district court subtracted their earnings at General Motors from their back pay awards. Ford insists that the district court should have gone further. Ford contends that the back pay period of Gaddis and Starr should have been terminated when they rejoined General Motors.
 
 
 34
 Ford's argument misses the point of a Title VII back pay award. Under Title VII, a district court awards back pay in order to put the discrimination victim in the position she would have occupied if the defendant had not discriminated against her. Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Pursuant to this purpose, the district court constructed the claimants' hypothetical employment histories, calculated what they would have earned if they had not been victims of discrimination, subtracted what they actually earned during the period, and awarded the difference in back pay. We prescribed this formula in UTU, 532 F.2d at 341, because it makes the discrimination victim whole while denying her a double recovery. If the back pay period ended when a discrimination victim obtained substantially equivalent temporary employment, as Ford suggests, the discrimination victim would not be made whole, because her back pay period would be shorter than her hypothetical work history. Ford's proposed rule is thus contrary to the intent of Title VII, since it does not fully compensate the discrimination victim.
 
 
 35
 Moreover, the procedure followed by the district court is completely in accord with the statute. In 42 U.S.C. § 2000e-5(g), Congress provided: "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." Thus, the statute requires only that interim earnings be deducted from the back pay award, the very procedure implemented by the district court; but it does not require, as Ford urges, that the back pay period end when a discrimination victim accepts other temporary employment. The back pay period may continue past the acceptance of another job by a discrimination victim, as long as the victim's earnings are subtracted from the back pay award.
 
 
 36
 In this case, the district court properly found that the hypothetical employment histories of the women would extend beyond their employment at General Motors. The two men who were hired instead of Gaddis and Starr worked until the time of trial. Unlike the women, who were unable to continue at General Motors, the two male Ford workers were steadily employed from 1971 until 1977. Thus, if Ford had hired Gaddis and Starr in 1971, in all probability they would have worked until 1977.[6]
 
 
 37
 Ford also argues that the result reached by the district court is contrary to the method followed by the National Labor Relations Board under the National Labor Relations Act, 29 U.S.C. § 160. Ford contends that the NLRB has implemented a rule of ending back pay periods when a discrimination victim obtains substantially equivalent employment, even if the discrimination victim is subsequently laid off.
 
 
 38
 In fact, the approach under the NLRA is identical to the approach adopted by the district court. In NLRB v. Mastro Plastics Corp., 354 F.2d 170 (2 Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966),[7] the guilty employer made the same argument advanced by Ford. Both the Board and the court rejected the employer's position. The court explained:
 
 
 39
 Several discriminatees secured substantially equivalent employment or became self-employed during the back pay period and yet suffered additional losses thereafter. Mastro argues that the taking of such employment terminates completely its back pay obligation. We do not agree. The only issue here is whether the discriminatee willfully incurred a loss of earnings. It would be unjust to require him to mitigate his damages to the greatest extent possible but then to penalize him for substantial but short-lived success. Unless in taking substantially equivalent or self-employment the discriminatee willfully forwent greater earnings, his back pay should not be reduced beyond the interim earnings he in fact received.
 
 
 40
 Id. at 179.
 
 
 41
 This passage highlights the central weakness of Ford's argument. If the back pay period ended completely when a discrimination victim accepted substantially equivalent employment, then a discrimination victim would be discouraged from mitigating damages. She could accept equivalent employment only by forfeiting continued back pay rights, with the risk that her new job might end and leave her without income from any source. Many discrimination victims might choose unemployment and continuing back pay over employment which might be short-lived. Title VII, like the NLRA, should be interpreted so as to encourage mitigation of damages by discrimination victims in order to reduce the back pay liability of Title VII defendants would be ill-served by a rule which encouraged discrimination victims to remain idle.[8]
 
 
 42
 Therefore, by refusing to terminate the back pay period when Gaddis and Starr returned to General Motors, the district court furthered two policies underlying Title VII. It made Gaddis and Starr whole, by awarding them back pay during their entire hypothetical work histories at Ford. At the same time, the district court followed a rule which induces Title VII discrimination victims to mitigate damages. Without reservation, we affirm the district court's decision.
 
 
 43
 (b) Job Offers
 
 
 44
 Later in 1973, while Gaddis and Starr were working at General Motors, Ford offered a permanent warehouse job to Gaddis. She declined the offer. Then Ford offered the job to Starr, who likewise declined. Ford asserts that its back pay liability cannot extend past the time when Gaddis and Starr turned down the offers.
 
 
 45
 The district court found that one principal reason why Gaddis and Starr rejected Ford's offer was because they would have been forced to abandon their seniority at General Motors. By accepting a job with Ford and leaving General Motors, Gaddis and Starr would have forfeited all their rights at General Motors. Ford's offer did not include retroactive seniority to the time of the 1971 hirings. Ford presented Gaddis and Starr with an offer of mere beginning employment.
 
 
 46
 We have twice held under Title VII that victims of discrimination need not accept job offers which include a loss of seniority in order to preserve their back pay rights. In UTU, 532 F.2d at 340, we explained:
 
 
 47
 A refusal to commit seniority suicide is not an acceptable reason to deny back pay. Victims of discrimination should not be required to forfeit wage and security benefits accruing because of their seniority in order to remain eligible for purely speculative future back pay relief. A general rule requiring such action would frustrate the central purposes of Title VII.
 
 
 48
 Accord, Hairston v. McLean Trucking Co., 520 F.2d 226, 232 (4 Cir. 1975) (plaintiff's refusal of promotion or transfer because of a discriminatory loss of seniority is not a defense to plaintiff's back pay claim).
 
 
 49
 Ford would present Gaddis and Starr with a similarly intolerable choice. Under Ford's legal theory, if Gaddis and Starr rejected Ford's offer and stayed at General Motors, they would forego their rights to further back pay benefits. On the other hand, if they accepted the job offered by Ford, which they had not held for the previous two years because of Ford's discriminatory hiring policy, they would lose their seniority rights at General Motors. Thus, Ford's job offer was tainted by the effects of the discrimination it had practiced in 1971. Gaddis and Starr could accept the offer only by forfeiting the seniority they had accumulated at General Motors and without a compensating offer of seniority at Ford to alleviate the effects of the discrimination against them in 1971. As in Hairston and UTU, the result advocated by Ford would "frustrate the central purposes of Title VII."
 
 
 50
 Our decision is in accord with the decisions of three other circuits. In Comacho v. Colorado Electronic Technical College, Inc., 590 F.2d 887 (10 Cir. 1979) (per curiam), a woman sued a college under Title VII for discriminatorily firing her. She prevailed and was awarded back pay. The college argued that her right to back pay was terminated when the college made her an offer of reinstatement. The Tenth Circuit replied:
 
 
 51
 42 U.S.C. § 2000e-5(g) ... gives the trial court discretion as to the remedies. The obvious purpose of the Act is to compensate persons for injuries suffered on account of unlawful discrimination. Congress clearly intended that the remedies employed would "make whole" as nearly as possible any person injured under the Act.... An offer of reinstatement without back pay does not "make whole" the person injured by an illegal firing. Such a holding would circumvent the objectives of Title VII. The college thus did not offer to fully compensate plaintiff, but merely offered to reemploy her.... Thus we must hold that a reinstatement offer without back pay does not relieve a guilty employer from further liability.
 
 
 52
 Id. at 889.
 
 
 53
 In Jurinko v. Edwin L. Wiegand Co., 477 F.2d 1038 (3 Cir.), vacated on other grounds, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973), the district court held that discrimination against the plaintiffs ceased when they were offered jobs by the defendant. The Third Circuit rejected this portion of the district court's opinion, stating:
 
 
 54
 The terms of the 1969 job offers were within Wiegand's control, and it did not offer the plaintiffs back seniority or back pay. The offer that was made did not rectify the effects of its past discrimination, and the plaintiffs were under no duty to accept such an offer.
 
 
 55
 Id. at 1047.
 
 
 56
 Similarly, in Claiborne v. Illinois Central Railroad, 583 F.2d 143, 153 (5 Cir. 1978), cert. denied, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979), the Fifth Circuit held that: "Failure to accept an offer of reinstatement in a Title VII case does not necessarily terminate the right to relief, so long as those amounts earned elsewhere or earnable with reasonable diligence are deducted from each plaintiff's award." Furthermore, the Fifth Circuit explained that "the disadvantages to an employee returning to the railroad without retroactive seniority" would "more than justify" an employee's decision to refuse an offer of reinstatement. Thus, the Fifth Circuit, like the Third and the Tenth, would find, as we do, that Ford's job offers to Gaddis and Starr did not end their back pay periods.[9]
 
 
 57
 Further, it should be noted that Ford was benefited by the employment of Gaddis and Starr at General Motors. Their earnings at General Motors were deducted in the calculation of their back pay awards. Gaddis and Starr reduced Ford's back pay liability by working at General Motors.
 
 
 58
 In sum, the district court reached an eminently reasonable result. It did not permit Ford to cut off the back pay period by making Gaddis and Starr an incomplete and unacceptable offer, and it denied Gaddis and Starr a double recovery by deducting their General Motors wages from their back pay awards. We affirm this aspect of the district court's decision.[10]
 
 
 59
 (c) Nurses Training
 
 
 60
 In September, 1975, Gaddis and Starr entered a nurses training program, a CETA program for the unemployed. Ford asked the district court to terminate the back pay period of Gaddis and Starr upon their entry into the program. The district court refused. Instead, the court accepted the special master's report which treated the training program as employment and reduced the back pay awards by forty hours of minimum wage earnings for each week the women spent in the program.
 
 
 61
 On appeal, Ford again presses the argument that its back pay liability should not extend beyond the date when Gaddis and Starr entered the nurses training program. We think that there are four reasons why Ford should not prevail.
 
 
 62
 First of all, Gaddis and Starr did not remove themselves from the labor market when they entered the CETA program. Both testified that they would have accepted work had it been offered to them. The special master's report credited their testimony. He found that the two women had not removed themselves from the labor market, and his finding was adopted by the district court. Because this determination was a reasonable credibility determination, we cannot treat it as clearly erroneous.
 
 
 63
 Two courts have decided similar cases in which Title VII claimants entered school after suffering discrimination at the hands of an employer. Those courts have decided that the critical determination is whether the claimant remained "ready, willing, and available" for employment. Taylor v. Safeway Stores, Inc., 524 F.2d 263, 267 (10 Cir. 1975); United States v. Wood, Wire & Metal Lathers Local 46, 328 F.Supp. 429, 439, 443-44 (S.D.N.Y.1971). If the claimant is ready, willing, and available for work, these courts have suggested, the back pay period does not come to a close when the claimant enters school.
 
 
 64
 The district court in this case followed the rationale of these cases by instructing the special master to ascertain whether Gaddis and Starr had removed themselves from the labor market. We conclude that the district court acted correctly in ordering the special master to examine the availability of these two particular women for work, rather than mechanically ending the back pay period upon their entry into the CETA training program. The "ready, willing, and able" test followed by the district court permits the relief in each case to be fitted to fit the circumstances of particular claimants.
 
 
 65
 Second, the CETA training program closely resembled employment. Both women received the minimum wage for the time they spent in the training program. Both testified that they regarded the program as employment. Indeed, the apparent intent of the CETA program is to provide the unemployed with work while at the same time preparing them for future employment.
 
 
 66
 The special master treated the training program as employment like the claimants' temporary employment at General Motors. As with the wages the women earned at General Motors, the special master subtracted the wages the women earned in the training program from Ford's back pay liability. 42 U.S.C. § 2000e-5(g). In addition, the district court took every precaution to insure that Ford was not unfairly burdened by back pay liability. Even though Gaddis and Starr sometimes attended the program for less than forty hours per week, the district court subtracted forty-hours of earnings for each week they spent in the program. In this fashion, the district court properly treated the nurses training program as the equivalent of employment and also guaranteed that Gaddis and Starr did not receive more than one full recovery.
 
 
 67
 Third, Gaddis and Starr were enrolled in the program as a result of their presence on the unemployment compensation rolls. Gaddis and Starr were receiving unemployment compensation when they began the training program. Both testified that they did not sign up for the CETA program on their own and that they enrolled at the urging of the state unemployment compensation office. In fact, a representative of the state agency testified that their unemployment benefits would have been cancelled if they had not enrolled in the CETA program. As the special master found, "(T)his course of action was recommended very strongly by the North Carolina Employment Security Commission."
 
 
 68
 Gaddis and Starr were unemployed as a direct result of the discrimination against them by Ford. As the employment histories of the men hired in 1971 demonstrate, if Ford had not discriminated against Gaddis and Starr in 1971, they probably would not have been receiving unemployment compensation. But for Ford's discriminatory hiring practices, they would have had no need of a CETA program. However, because they were unable to find work and because they were a burden on the state unemployment compensation fund, Gaddis and Starr were convinced by the state to enroll in the CETA training program. Ford cannot equitably be relieved of Title VII back pay liability because of an event which flowed directly from its discriminatory actions. The district court reached the proper result when it refused to terminate Ford's back pay liability upon the entry of Gaddis and Starr into the CETA training program.
 
 
 69
 Fourth, as has been detailed above, the district court did not abuse its discretion, see Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), when it chose not to end these claimants' back pay period with their enrollment in the nurses training program. As the Tenth Circuit indicated in Taylor, 524 F.2d at 268, district courts have discretion to examine the particulars of a claimant's entry into school and to decide whether the employer's back pay liability should end or continue. In this case, the enrollment of Gaddis and Starr into nurses training is colored by several facts, including their availability for work, the similarity between the CETA program and employment, and the close connection between the state unemployment compensation agency and the CETA training program. When all these factors are considered, it is apparent that the district court did not abuse its discretion when it permitted Ford's back pay liability to continue during the training program, while giving Ford credit for the claimants' possible minimum wage earnings during the period.
 
 
 70
 (d) Unemployment Compensation
 
 
 71
 Ford argues that the awards of all three women should be reduced by the amount of unemployment compensation they received during the back pay period. The district court did not deduct unemployment compensation from the back pay awards. We conclude that the district court ruled correctly.
 
 
 72
 There is a division of authority over the deduction of unemployment compensation from Title VII back pay awards. Some district courts have subtracted unemployment compensation in computing back pay. See, e. g., Heelan v. Johns-Manville Corp., 451 F.Supp. 1382 (D.Colo.1978).
 
 
 73
 On the other hand, one district court in this circuit has decided that monies received as "state unemployment compensation 'are made to carry out an independent social policy' and are not deductible from a back pay award under Title VII." Abron v. Black & Decker Manufacturing Co., 439 F.Supp. 1095, 1115 (D.Md.1977), quoting Inda v. United Air Line, Inc., 405 F.Supp. 426 (N.D.Calif.1975) aff'd in part and vacated in part, 565 F.2d 554 (9 Cir. 1977), cert. denied, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978). See also Tidwell v. American Oil Co., 332 F.Supp. 424 (D.Utah 1971).
 
 
 74
 In an analogous context, the Supreme Court has decided that unemployment compensation need not be deducted from back pay awarded under the NLRA. NLRB v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951). The Supreme Court's analysis is particularly convincing:
 
 
 75
 ... To decline to deduct state unemployment compensation benefits in computing back pay is not to make the employees more than whole, as contended by respondent. Since no consideration has been given to collateral losses in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received.
 
 
 76
 ... Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state. (citations omitted). We think these facts plainly show the benefits to be collateral. It is thus apparent from what we have already said that failure to take them into account in ordering back pay does not make the employees more than "whole" as that phrase has been understood and applied.
 
 
 77
 Id. at 364, 71 S.Ct. at 339 (emphasis in original).[11]
 
 
 78
 Based on the Abron decision, the analysis of the Supreme Court, and the remedial policies of Title VII, we agree with the district court that "awards of back pay under Title VII should not be affected by a system of compensation which is designed to serve a wholly independent social policy." To decide otherwise would undercut to some degree the corrective force of a Title VII back pay award.
 
 
 79
 (3) Conclusion
 
 
 80
 Many of Ford's objections contest the factual findings and credibility determinations of the district court and the special master. Because we find none of them clearly erroneous, we do not overturn any of these resolutions of conflicting facts and testimony. Most of the rest of Ford's contentions challenge the district court's exercise of discretion in framing a remedy. As indicated above, we find that the district court did not abuse its discretion but, on the contrary, closely examined each issue to determine an equitable adjustment of Ford's back pay liability. Consequently, we affirm the district court's decision with respect to Gaddis, Starr, and Smith.
 
 B. 1973 Opening
 
 81
 (1) Discrimination
 
 
 82
 In 1973, Ford hired Roger Simpson to fill a single vacancy at the warehouse. Ford passed over eleven women who had applied for the job. In its order of reference to the special master, the district court found that EEOC had established a prima facie case of discrimination against the eleven. Upon referral, while the special master concluded that Ford did not act with discriminatory intent when it hired Simpson, he did conclude that Ford had acted pursuant to a pattern or practice of discrimination. The district court approved the special master's report. Ford raises several challenges to the court's conclusion that it discriminated against the eleven female applicants.
 
 
 83
 (a) Disparate Impact or Disparate Treatment
 
 
 84
 First, Ford argues that this case from the beginning has been a disparate treatment case founded on an allegation that Ford intentionally discriminated against the eleven women. Because of this assumption, Ford insists that the special master in effect ruled that EEOC had failed to set forth a prima facie case, by finding that Ford acted with no discriminatory intent when it passed over the eleven women.
 
 
 85
 It is true that the Title VII case against Ford with respect to the 1971 openings was founded on a disparate treatment theory. The district court found that as of 1971 Ford followed vague and subjective hiring criteria, and that Ford's personnel stated that Ford did not hire women to work in the warehouse. And, under McDonnell Douglas, Ford failed to articulate a legitimate nondiscriminatory reason for its decision to hire three men to fill the 1971 vacancies. The district court thus uncovered discriminatory intent behind the 1971 hirings.
 
 
 86
 The district court's Title VII ruling with respect to the 1973 opening, however, was grounded on a finding of disparate impact, not disparate treatment. When it referred the case to the special master, the district court found that "the plaintiff (had) established a prima facie case of discrimination" as to the eleven women. The special master interpreted this language as a finding of disparate impact rather than disparate treatment, and accordingly ruled against Ford because of its finding that Ford's employment policies resulted in a pattern or practice of discrimination against the eleven women.
 
 
 87
 In its order approving the special master's report, the district court responded to the argument Ford makes here and confirmed that the special master correctly interpreted the referral order. The district court explained that its order contained "a finding by the court of a pattern and practice of discrimination against women. This was the correct interpretation of the court's conclusion of law, although the word 'pattern' was not used by the court."
 
 
 88
 Of course, as the district court perceived, Title VII condemns both intentionally discriminatory employment policies and employment practices which only have a disparate impact on women. Albemarle Paper Co.; Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). As well, in any given case, disparate treatment and disparate impact may serve as alternative theories upon which a right to relief may be established. Wright v. National Archives & Records Service, 609 F.2d 702, 710-11 (4 Cir. 1979) (in banc).
 
 
 89
 Consequently, Ford cannot challenge the plaintiff's prima facie case by pointing to the special master's finding of no discriminatory intent. The district court could determine that Ford violated Title VII based upon a disparate impact theory, which does not require a finding of discriminatory intent. Nor can Ford object to the district court's reliance on a disparate impact theory, even if a disparate treatment theory was also considered as a basis for relief in connection with the 1971 openings, the 1973 opening, or both. As we explained in Wright, a district court is free to rely on either theory.
 
 
 90
 (b) Pattern or Practice
 
 
 91
 Second, Ford contends that even if this case rests on a finding of disparate impact, EEOC did not establish a prima facie case because it failed to prove a pattern of discrimination. We find, however, that EEOC showed both that Ford's hiring history revealed a pattern of discrimination against women and, whatever the probative force of the statistics, that the employment practice followed by Ford in filling the 1973 opening had a disparate impact upon women.
 
 
 92
 As of 1973, Ford had never hired a woman to work in its warehouse as a permanent employee. Between 1971 and 1973, Ford had two openings for permanent employees. The first opening was filled by David Martin, whom the district court found was hired because of his qualifications. The second position was offered to Gaddis and Starr, and Ford urges that these offers demonstrate that Ford was not using a discriminatory employment policy during the period. The district court discovered, however, that the offers were made to Gaddis and Starr only after Ford learned that Gaddis had filed a sex discrimination charge against it with the EEOC. Consequently, these offers are entitled to little weight. Subsequently, Simpson, a man, was hired to fill the position.
 
 
 93
 EEOC's case is less than totally convincing, because Ford made only one contested employment decision between 1971 and 1973. Nevertheless, this history amounts to a total exclusion of women from permanent employment at the warehouse, except when Ford felt the threat of an EEOC complaint. And, Ford's record of pre-1972 employment discrimination gives these facts more force. Consequently, while there were few hiring decisions during the period, we think that the district court reasonably inferred from the record a pattern of discrimination against women.
 
 
 94
 But even if the bare record of Ford's hiring decisions is insufficient, the method Ford used to hire Simpson was clearly an employment practice which had a disparate impact on women. Ford considered applications inactive after six months unless the applicant contacted the warehouse to update his application. Ford did not inform applicants of this policy. Simpson had filed his application in 1971, approximately two years prior to the date Ford hired him in 1973. Simpson had done nothing to update his application. Instead, as the special master found, an employee at the warehouse, who was Simpson's friend, "birddogged" his application. Simpson was hired, the special master concluded, at least in part to accommodate his friend.
 
 
 95
 Of the seven women who appeared before the special master, three had applied over six months before the opening was filled and therefore would not have been considered. Under Ford's policy, they were unaware that they had been eliminated by the passage of time and did not benefit from the special treatment Simpson received. The remaining four had applied within six months and therefore should have been considered for the job. Yet, they had no advantage over Simpson even though their applications were current and his had long been inactive.
 
 
 96
 It is apparent that Ford's hiring policy had a discriminatory impact upon women applicants. First of all, their applications were subject to the six-months rule, without their knowledge. Friends of warehouse workers, such as Simpson, had the benefit of assistance from inside the warehouse to keep their applications current. The influence of warehouse employees was critical in the selection of new workers, at least in this instance. Because male workers are likely to recommend their male friends as prospective employees, male applicants were more likely to be hired at the warehouse than female applicants. As the special master found, this informal secret selection process led to "an environment with loose employment procedures" which "operated to perpetuate the status quo i. e., as all-male warehouse." Ford's hiring habits, then, served to exclude women from the warehouse and foreclosed eleven women from serious consideration for the 1973 vacancy.[12]
 
 
 97
 The decision of the district court virtually is compelled by our holding in Barnett v. W. T. Grant Co., 518 F.2d 543, 549 (4 Cir. 1975). In that case, the Title VII plaintiff attempted to prove discrimination through statistics, which we found "quite suggestive," if not "overwhelming." As in this case, the plaintiff's proof went beyond statistics:
 
 
 98
 In addition to statistics, a court must also examine "patterns, practices, and general policies to ascertain whether racial discrimination exists." (citations omitted). Word-of-mouth hiring, which the district court found to be Grant's primary method of recruiting new (employees), is discriminatory because of its tendency to perpetuate the all-white composition of a work force.
 
 
 99
 In harmony with Barnett, we find that Ford's informal hiring procedure, which relied heavily on the recommendation of a current employee, was discriminatory because Ford's workforce consisted only of men.
 
 
 100
 (c) Relative Qualifications
 
 
 101
 Ford makes one final argument to overturn the decision of the district court. Ford contends in response to this prima facie case that it hired Simpson because he was better qualified than the women applicants. To begin with, the special master found that the women applicants, like Simpson, were qualified to work as picker-packers.[13] All had previous clerical or industrial work experience, ample training for "picking" and "packing;" and thus the special master's finding was not clearly erroneous.
 
 
 102
 More to the point, as the special master found, the applications of the women did not receive a "fair comparison" with Simpson's because of the recommendation of the male warehouse employee. Simpson was the only applicant who received an interview; even the women who had current applications were not interviewed. The influence of the warehouse employee was thus an important motivating reason for Simpson's selection. Ford cannot rely on relative qualifications when the recommendation of a warehouse employee played a key role in Simpson's selection and when the female applicant did not receive serious consideration.
 
 
 103
 (2) Back Pay
 
 
 104
 The district court awarded the 1973 women applicants back pay. Seven appeared before the special master to prove their damages. Under the instructions of the district court, the special master calculated each woman's back pay and awarded one-seventh of each sum, because Ford only filled one vacancy in 1973. Ford does not contest this aspect of the district court's decision.
 
 
 105
 Ford does object to the length of the back pay period. After working several months, Simpson was laid off on February 6, 1974. Simpson's recall rights expired by the time Ford was ready to fill his vacant position. At that time, in September, 1975, Ford did not recall Simpson, but in his place hired Doris Baumgardner, who was Ford's first female permanent picker-packer.
 
 
 106
 The special master found that in the usual situation Ford recalled laid-off employees, even when their recall rights had expired. Because the hiring of Baumgardner was an unusual case, the special master did not terminate the back pay period with Simpson's layoff. Instead, the special master included Baumgardner's employment within the back pay period for the eleven women.
 
 
 107
 Ford argues that this extension of the back pay period was improper. According to Ford, "the court was required to track the actual work experience of the employee allegedly favored by Ford's alleged discrimination." Ford's proposed rule is unacceptable because it bears no relation to the purpose of a Title VII back pay award.
 
 
 108
 The purpose of a back pay award is to make the discrimination victim whole, to erase the effects of illegal discrimination. To accomplish that purpose, courts construct the hypothetical employment history of the discrimination victim to determine the appropriate back pay period. UTU, 532 F.2d at 341.
 
 
 109
 Frequently, the employment history of the applicant who was actually hired will provide the best guide to the hypothetical employment history of the discrimination victim. In fact, the district court in this case used the employment history of the men hired in 1971 to determine the back pay periods for Gaddis, Starr, and Smith. But the employment history of the employee is not controlling in and of itself. Actual employment histories are used only when they are the best available guide to the hypothetical employment history of the discrimination victim. The focus is on the probable job career of the victim, who is to be made whole, not on the career of the actual employee, who is of course not a party to the Title VII case.
 
 
 110
 In this instance, the special master tracked Simpson's work history, but only to a point. Simpson's employment history was used as the best indicator of the probable work history of the female applicants until Doris Baumgardner was hired to fill his job. At that point, the special master found that Simpson's employment history was abnormal. The testimony of Ford's warehouse manager revealed, as the special master found, that normally employees are recalled even after their recall rights had expired. In this case, Simpson was not recalled, and a woman was hired in his place. Ford's departure from its usual practice took place after EEOC filed this sex discrimination suit.
 
 
 111
 It was apparent, then, that Ford's decision not to recall Simpson was out of the ordinary, a product of unusual circumstances. As a result, Simpson's work history failed as an indicator of the probable work history that one of the seven women would have had. Since laid-off employees were usually recalled, the special master made the only reasonable decision when he abandoned Simpson's actual work history and concluded that one of the seven women would have probably been recalled if she had been hired. If the special master had instead followed Simpson's work history, the special master would have based the back pay period not on the hypothetical work history of the discrimination victim, but on the peculiarities of Simpson's situation. That approach would have been contrary to UTU and to the "make whole" doctrine of Albemarle Paper Co.
 
 
 112
 The special master adhered to the dictates of UTU and Albemarle Paper Co., by constructing the hypothetical work histories of the women. In our view, the special master reasonably decided that if one of the women had been hired in 1973 she would have been recalled in 1975 even though Simpson was not.
 
 III.
 
 113
 In its complaint, EEOC asked the district court to "make whole those persons adversely affected by (sex discrimination), by providing appropriate back pay, with interest, ... and other affirmative relief necessary to eradicate the effects of unlawful employment practices." As described above, the district court meticulously formulated a back pay award to correct the effects of sex discrimination against the women applicants.
 
 
 114
 But the district court offered the women no further remedies. Under Title VII, district courts have discretion in the formulation of remedial orders. E. g., Franks v. Bowman Transportation Co. At the same time, district courts have a duty to grant the "fullest relief possible to the victims of discrimination," to insure that the effects of discrimination are totally removed from the lives of discrimination victims. Albemarle Paper Co., 422 U.S. at 418, 95 S.Ct. at 2372, see also UTU, 532 F.2d at 341.
 
 
 115
 In this case, the district court did not discuss possible remedies other than back pay. In its findings of fact and conclusions of law, in its referral order to the special master, and in its order adopting the special master's report, the district court did not address other remedial steps. Under Albemarle Paper Co., then, the district court was obliged to consider other remedies and if it rejected them to articulate its reasons.
 
 
 116
 The district court may not have discussed other possible remedies because it concluded that Ford had made diligent efforts since 1975 to hire women. Although Ford's affirmative action program might justify the district court's decision not to order general affirmative relief against sex discrimination, Ford's anti-discrimination efforts do not alter the district court's responsibility to redress the discrimination suffered by these individual women. Ford's good faith since 1975 does not remove the burden placed upon the ten women by discrimination practices in 1971 and 1973. See UTU, 532 F.2d at 340.
 
 
 117
 In fact, these women are not aided in any fashion by Ford's program. They still do not possess the seniority they would have accumulated had they been hired in earlier years, and they do not yet have the jobs they might well have had if Ford had not discriminated against them. Ford's affirmative action program, then, does not excuse the district court's failure to consider additional relief for the individual women.
 
 
 118
 One seemingly desirable remedy in this instance would be to grant the women hiring preferences at the parts warehouse, with retroactive seniority. See 42 U.S.C. § 2000e-5(g); Teamsters v. United States, 431 U.S. 324, 325, 97 S.Ct. 1843, 1849, 52 L.Ed.2d 396 (1977); Franks v. Bowman Transportation Co.; Cathey v. Johnson Motor Lines, Inc., 398 F.Supp. 1107, 1122 (W.D.N.C.1974).
 
 
 119
 This remedy may be particularly appropriate for the three women who were not hired in 1971. Gaddis and Starr have had difficulty finding jobs since 1971. After their final layoffs from General Motors, they were forced to enter a CETA training program, apparently unable to find work in the auto parts field. If Ford had not discriminated against them in 1971, they might well have avoided this checkered employment career. Smith had been employed during much of the time since 1971, but at relatively low wages. She also might be entitled to a hiring preference with retroactive seniority.
 
 
 120
 The seven women who were not hired in 1973 present a more difficult case. Ford filled only one opening in 1973, and thus all seven cannot reasonably claim that they would have been employed by Ford since 1973 if Ford had not discriminated against them. However, the district court may be able to fashion a remedy, such as hiring preferences without seniority, which would grant them more complete relief than a back pay award.
 
 
 121
 If the district court decides to order Ford to hire any or all of these discrimination victims as positions come open, it should also consider whether the women should receive an additional monetary award to compensate them for the estimated earnings lost between the date of the district court's decision and the date of employment at the warehouse. See White v. Carolina Paperboard Corp., 564 F.2d 1073, 1091 (4 Cir. 1977). Such an award, along with back pay, preferential hiring, and retroactive seniority, would constitute the "fullest relief possible."
 
 
 122
 We emphasize that the terms and conditions of relief for discrimination victims is determined by district courts, not by this court. We only instruct the district court to consider these possible remedies; not necessarily to provide them. On remand, the district court should articulate its reasons for rejecting or accepting the additional relief proposed by EEOC.
 
 IV.
 
 123
 We affirm the district court's decision as a proper exercise of discretion founded on not clearly erroneous factual determinations. We remand for consideration of further remedies, so that the district court can fully exercise its discretion to formulate the most complete relief possible for these discrimination victims.
 
 
 124
 AFFIRMED AND REMANDED.
 
 
 125
 WALTER E. HOFFMAN, Senior District Judge, dissenting in part:
 
 
 126
 The District Court found that appellant, Ford Motor Company (Ford), had discriminated against ten women by failing to hire them by reason of sex, in violation of Title VII of the Civil Rights Act of 1964, and ordered back pay for each from the date of the discriminatory refusal of initial employment to the date of the filing of certain findings of fact and conclusions of law on December 30, 1977, together with compounded interest. Three of the women, Gaddis, Starr, and Smith, were determined to have been refused employment in 1971 when Ford hired three men; the remaining seven were not considered by Ford to fill an opening when, in 1973, a man was hired. The seven women were permitted to share one award.[1]
 
 
 127
 I agree with the District Court and the majority that the evidence supported a finding that Ford was guilty of discrimination for certain periods of time. My disagreement lies in the remedy fashioned by the District Court, as expanded by the majority. I shall deal with Gaddis and Starr collectively; individually with Zettie Smith; and collectively with the remaining seven women. As noted in footnote (1), if I am correct with respect to Smith, she would automatically be added to the group of seven women.
 
 Gaddis and Starr
 
 128
 Gaddis and Starr made written application for employment with Ford on July 21, 1971, after they had been laid off by General Motors (GM).[2] Three men commenced their employment with Ford in early or mid-August, 1971. At the time Ford hired the men Blanchard, Coe, and Rogers no consideration was given to the applications by Gaddis and Starr. Ford contends that its decision to hire the men was made prior to receipt of the applications from Gaddis and Starr, but at least two of three men were probably hired after July 21.[3] The men were interviewed for the jobs, whereas the warehouse manager only agreed to talk to the two women following their repeated requests for an interview and not until after the three openings had already been filled. While I agree that there was sufficient evidence of discriminatory practice not to hire women in a warehouse position in 1971, I do not suggest that an employer is required to update all applications for employment to the very moment of hiring in order to fill a position without discrimination. In November, 1972, Gaddis and Starr were given admittedly temporary employment by Ford for a period of approximately six weeks. Thereafter, they again went to work for GM on January 4, 1973, and, while employed by the latter, were given unconditional offers of employment by Ford in July, 1973, which both rejected.
 
 Back Pay: Employment Elsewhere
 
 129
 I believe that the District Court extended Gaddis's and Starr's back pay well beyond the time it should have done so as a matter of law. The employment both women obtained at GM in January, 1973, was substantially equivalent to that denied them by Ford approximately the same type of work, pay and conditions and lasted over a year. The period for back pay under Title VII and its model, the National Labor Relations Act (NLRA), does not end with any temporary or lesser employment that the rejected applicant or discharged employee may accept to mitigate damages, although such pay is subtracted from his total award. But once he obtains permanent, substantially equivalent employment, all back pay terminates.
 
 
 130
 The two courts, cited for the proposition that the womens' back pay should not stop with their employment by GM, did end each employer's liability when the employee obtained a permanent job at pay equal to that of the job illegally denied him or her. Butta v. Anne Arundel County, 473 F.Supp. 83, 89 (D.Md.1979) (Back pay stopped when rejected applicant had net full-time earnings equal to those of the position he was denied and in a job comparable to that withheld; once he was in that position, back pay did not resume again even when he voluntarily left for a lower-paying job); Weiner v. County of Oakland, 14 F.E.P. Cases 380 (E.D.Mich.1976) (Back pay ceased when applicant was promoted by the employer who hired her after defendant's illegal denial of employment to a position comparable to the one she was denied).
 
 
 131
 Although at the time of judgment the rejected applicant in Weiner was still in the comparable job, and in Butta, had left his comparable job voluntarily, whereas Gaddis's and Starr's jobs in Charlotte with GM no longer existed, neither case holds that a job must last until judgment in order for back pay to be cut off all together. Some courts have gone beyond these two cases in their pronouncements, stating broadly that Title VII damages end with "employment" or "a job", but those words have been in dicta. E. g., Taylor v. Safeway Stores, Inc., 524 F.2d 263, 267-68 (10th Cir. 1975) (Plaintiff entered school and court analogized to the rule: "If a discharged employee accepted employment elsewhere, there is little doubt that this would cut off any back pay award."); Milton v. Bell Laboratories, Inc., 428 F.Supp. 502, 515 (D.N.J.1977) (Although court found no discrimination, it set damages to run "until (plaintiff) took a job" in case its decision was reversed on appeal; the job he had taken was comparable in pay, however.). The view of courts deciding NLRA cases, although unstated, seems to be that employment elsewhere only cuts off back pay if it is substantially equivalent and permanent. Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); see also N.L.R.B. v. Mastro Plastics Corp., 354 F.2d 170, 179 (2d Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966) ("It would be unjust to require him to mitigate his damages to the greatest extent possible but then to penalize him for substantial but short-lived success."). The Board itself, however, has cut off back pay with a new job without stating any requirement that the job be permanent. E. g., Circle Bindery, 232 N.L.R.B. 1185, 1187-88 (1977); Star Baby, 140 N.L.R.B. 678, 683 (1963).
 
 
 132
 In my opinion, Gaddis's and Starr's employment with GM, because it was intended to be permanent and, in fact, lasted over a year, cut off Ford's back pay liability to them.
 
 
 133
 Throughout the majority opinion reference is made to the Gaddis and Starr employment by GM in January, 1973, as being "temporary". The record makes no reference to "temporary" employments, and there is no evidence from either Gaddis, Starr, or GM, that the employment in 1973 was not intended to be permanent. Indeed, the fact that Gaddis and Starr were offered a job with GM in Atlanta, following the closure of the Charlotte plant, is a rather clear indication that the positions were permanent. True, when GM left the Charlotte area in 1974, it can be argued that the result was a "temporary" job, but is this the test which courts should employ in determining whether employment is "temporary"? Even the majority agrees that if the January, 1973, employment by GM was permanent, this served as a cutoff for any back pay award.
 
 Back Pay: Refusal of Job Offer
 
 134
 Ford's offers of employment to Gaddis and Starr in July, 1973, were not contemporaneous. Gaddis, who had a reasonably satisfactory working record while engaged in her temporary employment by Ford, was given the first offer. After Gaddis rejected the offer, Ford contacted Starr with a similar offer, which Starr likewise rejected. The discussions between Ford and the two women at the time the offers were made involved no consideration of back pay or seniority rights. At trial, Gaddis and Starr indicated that they refused Ford's offers because neither wanted to be the only woman working in the warehouse, which was the primary reason they gave Ford at the time for declining the jobs, and because they did not want to lose their seniority rights at GM, where they were then employed and remained employed until January 25, 1974.[4] The latter reason was not conveyed to Ford at the time they rejected the offers.[5]
 
 
 135
 For the reasons stated, infra, I am of the opinion that, if the right to back pay for Gaddis and Starr did not terminate with their reemployment at GM on January 4, 1973, it certainly ended when they were given unconditional offers of permanent employment in the warehouse at Ford's plant in Charlotte in July, 1973. In its findings and conclusions the district court, citing one of its own decisions, Brown v. Colman-Cocker Co., 10 C.C.H., E.P.D. P 10,492 (W.D.N.C.1975), as precedent said:
 
 
 136
 Back pay due to Gaddis and Starr shall not be affected by their refusal to accept the single position offered to them in July, 1973, inasmuch as neither would have been confronted by that decision and its implications had both been hired in August, 1971.
 
 
 137
 The earlier opinion by Judge McMillan, however, dealt with a situation very different from that here involved, and its holding was quite distinct: An offer of reinstatement, not initial employment, was invalid because it offered only a lower-paying job instead of the same employment from which the plaintiff had been fired illegally. The case said nothing about including back pay or seniority in an offer.
 
 
 138
 The majority agreed with the District Court that Ford's offers to Gaddis and Starr were insufficient to stop back pay liability because, at the time of the offers of initial employment, Gaddis and Starr were employed by GM and had acquired at least minimal seniority rights. Ford's unconditional offer of initial employment did not include any retroactive seniority rights and, as the majority states (footnote 9, p. 193):
 
 
 139
 This failure of Ford to offer retroactive seniority prevents Ford from relying on its offers to Gaddis and Starr.
 
 
 140
 Nothing is said by the District Court or the majority as to how Ford could have made an offer of retroactive seniority rights to a new employee under Ford's collective bargaining agreement. Indeed, I hazard the assumption that an offer of retroactive seniority rights to a new employee would have been in direct violation of such an agreement, as contrasted with an offer to reinstate an employee who had been previously permanently employed by Ford and wrongfully discriminated against by a discharge.
 
 
 141
 Both Title VII and NLRA cases make clear that an employer is under no obligation to include such things as back pay and retroactive seniority in an offer of initial employment for the offer to be valid, as opposed to an offer of reinstatement to an illegally fired employee. NLRA cases give direct guidance in this area because Title VII "was expressly modeled on the back pay provisions of the National Labor Relations Act." Albemarle Paper Co. v. Moody, 422 U.S. 405, 419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). NLRA cases hold that an offer must be unconditional that is, the employer cannot condition the offer on the employee's agreement to abandon his rights to pursue claims to back pay and other rights. See, e. g., Elling Halvorson, Inc., 222 N.L.R.B. 534 (1976). ("The duty to reinstate is not fulfilled by a conditional offer of reinstatement."); N.L.R.B. v. St. Mary's Sewer Pipe Co., 146 F.2d 995, 996 (3rd Cir. 1945) (Offer to reinstate striking employees if they withdrew their unfair labor practice charges against the company was invalid.) Similarly, under Title VII, the employer cannot ask the employee to give up back pay or other rights as a condition to his offer of reinstatement or the offer will be invalid. In addition, under both Acts, the employer must offer the same job. A. W. Behney Construction Co., 224 N.L.R.B. 1083, 1087 (1976) ("An offer to reinstate an illegally discharged employee should be on the same terms that applied when the employee was fired."). The employer cannot cut off his back pay liability with the offer of a dangerous alternative to the job from which the discriminatee was illegally fired or one so "inferior" as to constitute a "demotion," Williams v. Albemarle City Board of Education, 508 F.2d 1242, 1244 (4th Cir. 1974) (en banc), or a lower-paying job, Colman-Cocker Co., supra; but see Knickerbocker Plastic Co., 132 N.L.R.B. 1209, 1218 (1961) (Offer of lower-paying jobs was valid to cut off back pay liability under NLRA for all but difference in salary between jobs fired from and one offered).
 
 
 142
 An unconditional offer of reinstatement that does not demand that the employee surrender his back pay or other claims is enough: the employer need not volunteer back pay or give up his rights to defend against those claims. For example, the Eighth Circuit, in finding an offer to be invalidly conditioned on an employee's dropping his unfair labor practice charges, said in dicta, "It is clear that had the Company's offer of reinstatement been conditioned solely on its refusal to give back pay, as the Company strenuously argues, then the offer of reinstatement would not have been invalidated." N.L.R.B. v. Midwest Hanger Co., 550 F.2d 1101 (8th Cir.), cert. denied 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 90 (1977). The Ninth Circuit cut off back pay when an employee rejected a reinstatement offer because it did not include back pay. N.L.R.B. v. Harrah's Club, 403 F.2d 865, 871 (9th Cir. 1968). The rationale is that, as long as the employer does not condition his offer on the employee's giving up his back pay rights, the employer need not promise back pay because the employee can accept the offer while still retaining the right to pursue back pay and other claims through judicial or administrative channels. See, generally, D'Armigene, Inc., 148 N.L.R.B. 2 (1964), enforced as modified, N.L.R.B. v. D'Armigene, Inc., 353 F.2d 406 (2d Cir. 1965); Differential Steel Car Co., 75 N.L.R.B. 741, enforced, N.L.R.B. v. Differential Steel Car Co., 179 F.2d 241 (6th Cir. 1949). As stated in Reliance Clay Products, 105 N.L.R.B. 135, 137 (1953), "The Board has held that a discriminatorily discharged employee may not refuse an unconditioned offer of reinstatement even though unaccompanied by back pay: that such offer tolls the employer's liability for back pay ...." This circuit has agreed, stating that the employer "having once offered reinstatement, is released from the back pay obligation from the date the offer was rejected." N.L.R.B. v. Huntington Hospital, Inc., 550 F.2d 921, 924 (4th Cir. 1977). The same is true of the employee's refusal of a valid job offer under Title VII: his back pay rights are cut off at that point. Cofield v. Goldman, Sachs & Co., 364 F.Supp. 1372, 1374 (S.D.N.Y.1973); Blakely v. Chrysler Corp., 407 F.Supp. 1227, 1230 (E.D.Mo.1975), rev'd on other grounds sub nom. Chrysler Corp. v. Mann, Trustee, 561 F.2d 1282 (8th Cir. 1977). The one Title VII case that has held otherwise, Comacho v. Colorado Electronic Technical College, Inc., 590 F.2d 887 (10th Cir. 1979), relied upon by the majority, involved an illegally fired employee, not as here applicants being illegally denied initial employment, and thus, its holding only dealt with offers of reinstatement: "Thus we must hold that a reinstatement offer without back pay does not relieve a guilty employer from further liability," Id. at 889.
 
 
 143
 Just as the above cases do not demand that an employer include back pay in his offer, so no NLRA or Title VII cases require that an offer of initial employment, to be valid to cut off back pay, include retroactive seniority to the date of the initial refusal to hire, as is held here by the majority.[6] All the cases cited by the majority deal with the need for an employer who has illegally fired one of his employees or denied that person promotion to include retroactive seniority in his reinstatement or promotion offer. The reasons cited as calling for an employer to make a discharged employee whole in a reinstatement offer do not apply to a new employee. The Fifth Circuit in Claiborne v. Illinois Central R.R., 583 F.2d 143 (5th Cir. 1978), cert. denied, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979), in remanding for the lower court to determine whether refusals by discharged employees of offers of reinstatement without retroactive seniority or back pay cut off their back pay rights, believed that each employee's refusal had to be looked at separately. "(T)he disadvantages to them of returning to the railroad without retroactive seniority, would more than justify a particular employee in refusing an offer of reinstatement." Id. at 153. Similarly, in United Transportation Union v. Norfolk & Western Railway Co., 532 F.2d 336 (4th Cir. 1975), cert. denied, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976), Judge Winter wrote for this circuit that refusals by blacks to accept promotions from predominantly black jobs to white jobs, with a concomitant loss of seniority, did not cut off their back pay rights because "(a) refusal to commit seniority suicide is not an acceptable reason to deny back pay. Victims of discrimination should not be required to forfeit wage and seniority benefits accruing because of their seniority in order to remain eligible for purely speculative back pay relief." Id. at 340. (emphasis supplied). Back pay is to be cut off, Judge Winter again wrote for this court in Hairston v. McLean Trucking Co., 520 F.2d 226, 232 (4th Cir. 1975), "(O)nly if the refusal (of an offer of transfer) was a free and voluntary act on the part of the employee, not constrained by any discriminatory employer practice or policy, ...." A refusal is not free and does not cutoff back pay if "motivated by reasonable reluctance to expose himself to another aspect of an employer's discriminatory employment policy, as for example, a discriminatory loss of seniority...." Id. (emphasis supplied).
 
 
 144
 It is clear that what this court has demanded is protection in a reinstatement or promotion offer for seniority already earned by employees of a defendant company. The distinction between those cases and the one at hand is clear: here the applicants were denied initial employment, had never worked for Ford before except on a temporary basis, and thus had no seniority rights "accrued" that they were being asked to "forfeit." The reasons why courts have not made the same demand of employers offering an initial job to an applicant illegally denied employment should be obvious: it would be unfair to present employees with accrued seniority; probably would create havoc in employer/employee relations, especially if the Company is unionized; and might be in clear violation of the employer-employee contract. See Meadows v. Ford Motor Co., 510 F.2d 939, 949 (6th Cir. 1975), cert. denied, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976), ("... where the burden of retroactive pay falls upon the party which violated the law, the burden of retroactive seniority for the determination of layoff would fall directly upon other workers who themselves had no hand in the wrongdoing found by the District Court."); Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980, 985 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970).
 
 
 145
 The Supreme Court has held that § 703(h), which protects a bona fide seniority system from Title VII's strictures even if it tends to perpetuate pre-Act discrimination, does not prevent courts from ordering defendants to grant retroactive seniority to applicants illegally refused initial employment. Franks v. Bowman Transportation Co., 424 U.S. 747, 762, 96 S.Ct. 1251, 1263, 47 L.Ed.2d 444 (1976). That holding, however, merely gives a court power to so order but does not obligate an employer to include such seniority voluntarily in an offer of employment. By analogy, courts also have the power to award back pay in judgments against companies determined to have violated Title VII, but the rule remains that an employer need not voluntarily include back pay in an offer of employment for such offer to be valid. The reasoning is the same here: Even though courts have the authority to order retroactive seniority in their decrees, employers need not grant that seniority in an offer of initial employment to a discriminatee for that offer to be valid. The theory behind an offer of employment, whether under NLRA or Title VII, is the same: a job comparable to the one denied the applicant or from which the employee was fired or to which he was refused promotion must be offered to him, without any encumbering conditions that would force him to give up certain rights. The employee can then accept if he wishes and pursue back pay, seniority, or other rights he believes he was denied, through the courts or administrative agencies. Conversely, that offer does not need to include a surrender by the employer of his right to defend against such claims. If the employee rejects that unconditional offer, his right to back pay is cut off. Here, Gaddis and Starr rejected unconditional offers of the same jobs for which they had applied. Those offers did not need to and did not include a grant of back pay or retroactive seniority, but, on the other hand, were not conditioned on the surrender by Gaddis or Starr of their rights to pursue those claims. Indeed, the majority refers to Ford's "unconditional" offer, although it qualifies that by stating that an offer of seniority was a prerequisite. Therefore, the offers were valid and their rejection by Gaddis and Starr cut off back pay and reinstatement rights.
 
 
 146
 Even were the court to hold otherwise that Ford's offer should have included seniority and back pay the failure of Gaddis and Starr to protest that lack of seniority and their clear indications that they rejected the offers primarily for other reasons estop them from relying on those excuses now. Neither told Ford at the time of the offers that they wanted retroactive seniority back to the date of Ford's first refusal to hire them; neither insisted on or even suggested they be given retroactive seniority as a condition to accepting the offer. The majority's view was that the women had a right to refuse the offers as invalid for lack of seniority, but, in my opinion, that explanation for their refusal should not be available to the women post hoc facto as an excuse for invalidating Ford's unconditional offers. In an analogous case, the Tenth Circuit overturned an award of back pay that the Board had continued past the employee's refusal of an offer because the Board found it was invalid due to too short a time for acceptance. In N. L. R. B. v. Betts Baking Co., 428 F.2d 156, 159 (10th Cir. 1970), the court wrote that the offer was valid despite the time restriction because "(w)e think that (the employee's) failure to complain of the time limitation precludes him from complaining of the reasonableness of the reporting time." In my opinion, Gaddis and Starr, by not complaining to Ford at the time of the offers about its failure to grant retroactive seniority, or back pay, are precluded from complaining later that Ford's offer to them was not valid for that lack.Back Pay: Full-Time Schooling
 
 
 147
 In September, 1975, as noted by the majority, Gaddis and Starr entered a CETA program for the unemployed and commenced a nurses training program. The same month Ford hired its first woman, Doris Baumgardner, as a permanent employee in the Ford warehouse. As reported by the Special Master, the CETA program required full-time participation. Gaddis completed her training course in September, 1976, and accepted employment as a licensed practical nurse at the Gaston Memorial Hospital. Starr, obviously not with the ability of Gaddis, graduated in 1977 and since November 4, 1975 has been a missionary, along with her husband, affiliated with the Maranatha Baptist Mission, Inc. Both Gaddis and Starr received the minimum-wage rate while undergoing training under the CETA program.
 
 
 148
 The Special Master, the District Court, and the majority held that Gaddis and Starr did not remove themselves from the labor market when they entered the CETA program. While I contend that their right to back pay should have been terminated either when they accepted permanent employment with GM or were afforded unconditional offers of permanent employment, I also disagree as to the effect of their entry into the CETA program.[7]
 
 
 149
 The issue for the court should be whether the women continued to seek employment after they began the program or, by entering the nurses training program, removed themselves from the job market. "(I)n order to establish eligibility for any award of back pay, a claimant must prove as a first step a sufficient investment of time and effort to show that he was ready, willing and available to take work...." United States v. Wood, Wire & Metal Lathers, 328 F.Supp. 429, 443 (S.D.N.Y.1971), aff'd, 471 F.2d 408 (2d Cir. 1973). "(A) claimant who ... chose not to work at all (e. g., upon returning to school) may not be deemed to have been 'ready, willing and available,' and thus eligible for compensatory (back) pay, ...." Id. at 444. The Tenth Circuit has said that "when an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a (Title VII) back pay award for the period while attending school also would be like receiving a double benefit." Taylor, supra, at 267-68.
 
 
 150
 That circuit upheld a cutoff of the employee's back pay rights despite the fact that, in contrast to Gaddis and Starr, "Taylor testified while attending school, he continued to look for employment" and, "had he found full-time work anytime prior to receiving his bachelor's degree in December 1971, Taylor asserts he would have accepted it." Id. at 267.
 
 
 151
 Under the NLRA, receipt of pay and travel expenses by an illegally fired employee while in a Manpower Training Program analogous to the pay received by the two women in the CETA program, was held to be "tantamount to having accepted a permanent job," and therefore to end the employer's back pay obligation. N. L. R. B. v. Ohio Hoist Manufacturing Co., 496 F.2d 14, 15 (6th Cir. 1974). The Seventh Circuit held that, under the Vietnam Veterans' Readjustment Act, a veteran's rights to lost wages from the former employer who refused to rehire him would continue during his schooling "unless on remand defendant (employer) can show that plaintiff abandoned his willingness to continue in its employ under the conditions mandated by the Act when he enrolled in the University ... as a student seeking a degree." Hanna v. American Motors Corp., 557 F.2d 118, 122 n.2 (7th Cir. 1977). That case dealt with an Act that, unlike the NLRA, was not a model for Title VII back pay and created very different conditions for an employee seeking to maintain his right to back pay. Gaddis and Starr claimed they felt under some pressure from the State of North Carolina to enter the program so as not to lose their rights to unemployment compensation, but they were not required by Title VII itself to enter school.
 
 
 152
 On the contrary, Title VII and NLRA cases make clear that the criteria should be the claimants' efforts to seek work and their availability to take jobs during the time they were in school. Although Gaddis "suppose(d)" she was still available for work, she admitted she made no effort to seek work after she became a full-time student because "I was considered having a job by working under the Man Power Program (CETA)." Even had Ford sought them out to make second offers after they entered CETA, by their own testimony, they were not at all sure they would have accepted. The evidence completely fails to support the district judge's necessarily implicit conclusion that they were seeking work, were available for same while in school, and would have accepted offers from Ford if made. It is my opinion that back pay, if not ended sooner, certainly should be terminated at this juncture. The Tenth Circuit's holding that back pay ends with full-time school analogizes a commitment to schooling to a decision to accept a permanent job. Taylor, supra, at 267-68. Under the majority's reasoning here that the womens' jobs at GM did not cutoff their back pay because they did not last until trial, the fact that Gaddis and Starr finished a nurses training program and that Gaddis is still employed as a nurse, Starr having left that profession voluntarily to become a missionary, should mean that the beginning of CETA training marked the end of back pay for the two because that schooling led to a permanent new profession; at that point, the rationale for back pay of compensation for losses no longer applied.
 
 Back Pay: Unemployment Compensation
 
 153
 I agree with the majority in upholding the District Court's decision not to deduct unemployment compensation payments received by Gaddis and Starr or any of the victims from their back pay awards. The Supreme Court's reasoning in N. L. R. B. v. Gullett Gin Co., 340 U.S. 361, 364, 71 S.Ct. 337, 339, 95 L.Ed. 337 (1951), as to NLRA awards is directly applicable here, Title VII awards being expressly modeled on NLRA back pay grants, Albemarle, supra, 422 U.S. at 419, 95 S.Ct. at 2372. I would not hold, however, as the majority seems to here, that unemployment payments must not be subtracted from Title VII awards. Majority Opinion at 196. Rather I would follow exactly the holding in Gullett Gin Co.: "... we hold that the Board had the power to enter the order in this case refusing to deduct the unemployment compensation payments from back pay, and that in doing so the Board did not abuse its discretion." Id. at 364, 71 S.Ct. at 339. Other circuits, relying on Gullett Gin Co., have understood this to be its holding and therefore upheld awards both deducting and refusing to deduct unemployment compensation as long as each decision is not an abuse of the lower court's discretion. E. g., Satty v. Nashville Gas Co., 522 F.2d 850, 855 (6th Cir. 1975), vacated and remanded on other grounds, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), on remand, 18 F.E.P. Cases 394, 401 (M.D.Tenn.1978); Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 401 (3d Cir. 1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 721 (7th Cir. 1969).[8] Similarly, courts in the Fourth Circuit should be free to exercise their discretion in making a determination on this issue, whereas the majority would seem to set it as the rule in this circuit that such payments should not be deducted.
 
 
 154
 The end result of the lower court's refusal to cut off back pay for Gaddis and Starr at any point either when they obtained almost identical employment for over a year, refused valid unconditional offers from Ford, or removed themselves from the job market to enter a full-time nurses training program to learn a new profession that one woman still practices today is that Ford must reimburse the two women the aggregate sum of $88,843.50. That total could go beyond $100,000 under the majority's decision to keep the clock running for perhaps another three years until both are given a second chance to refuse job offers in Ford's warehouse.
 
 Zettie Ann Smith
 Liability
 
 155
 In footnote 4, p. 188, the majority states that "Smith's testimony is not a model of clarity." In light of the record, this is a mild expression.
 
 
 156
 The name of this witness was not included by the EEOC in the pretrial order. Ford's counsel objected (App. 677) when she was first called by plaintiff. Admittedly, Smith filed an application for employment on March 5, 1973. However, before the district judge she was asked about applications with Ford, and she replied (App. 683):
 
 
 157
 "A. In 1971, I was out in April and filed an application, and in 1971, in June, I was out and filled out an application, I believe.
 
 
 158
 "Q. Do you remember what happened?
 
 
 159
 "A. In 1972, I was out one time and filled out an application and this, I believe was my last application out there.
 
 
 160
 "Q. So, was that four applications in all that you have given?
 
 
 161
 "A. I think so.
 
 
 162
 "Q. 1971.
 
 
 163
 "A. And 1972 and 1973.
 
 
 164
 "Q. That's three applications.
 
 
 165
 "A. That is three applications and I believe I was out in 1974 and filled out an application, because this was just right after I had gone to Terrell Machine, and I thought that I would not be satisfied with the job there." (App. 684).
 
 
 166
 Based solely upon this testimony the District Court found (App. 60) that Smith applied in June, 1971, for a warehouse job. The reason the District Court accepted the June, 1971 date in preference to April, 1971, is not explained by the record.
 
 
 167
 Immediately after Judge McMillan filed his findings and conclusions as to the right of Zettie Smith to receive back pay based on a June, 1971 application, Ford moved to amend the findings as to Smith (App. 73-76), with particular reference to when she first applied for employment, asserting the following:
 
 
 168
 1. No knowledge during the E.E.O.C. investigation, discovery, settlement negotiations, or at any time prior to trial, that anyone other than Gaddis and Starr would be entitled to back pay for individual discrimination.
 
 
 169
 2. Ford's inability to prepare its defense to any claims that Smith filed an application in 1971, and the fact that E.E.O.C. had examined Ford's files and in 1973 when applications of Gaddis, Starr and other women applying in November, 1972, and thereafter, were located.
 
 
 170
 3. E.E.O.C. made no attempt to conciliate as to any claim by Smith.
 
 
 171
 4. The finding by the district court makes Smith the first woman to apply for a warehouse position at Ford, despite all testimony (except Smith's) that Gaddis and Starr were the first female applicants.
 
 
 172
 Three days later the District Court denied Ford's motion (which included a request to present further evidence after an opportunity to prepare) and directed that the finding should stand. Thus, when the matter went before the Special Master, Ford could not present evidence contradicting the finding by the District Court. The final result was that Smith was awarded $30,718.61 in back pay whereas, if her application was in fact filed in March, 1973 (which is admitted), Smith would then only participate in one-eighth of the back pay loss for one position an amount at most in the neighborhood of $3,000.00, assuming the majority is correct as to its discussion with respect to seven women, and, in my view, far less than $3,000.00.
 
 
 173
 Ford's policy was undeniably to require written applications. The District Court has found that a written application was filed by Smith in June, 1971. EEOC argued that the lack of a written application for Zettie Smith before 1973 was not relevant, because Ford threw away applications after six months, but the presence of the 1971 applications by Gaddis and Smith, and the 1973 applications by Smith and Simpson, among others, contradict that contention. Ford's manager testified that Gaddis and Smith were the first women to apply for jobs in the warehouse. The Ford receptionist also testified that Gaddis and Starr were the first women who applied for such jobs in the warehouse in Charlotte, but, because she was only one of Ford's receptionists and at that time only relieving the regular receptionist at lunch and other breaks, her testimony was not persuasive. A further hearing would allow Ford to present, among other evidence, the testimony of all its regular receptionists for that period, so as to cover all those who could have possibly received an application from Zettie Smith in 1971.
 
 
 174
 Under McDonnell Douglas, supra, 411 U.S. at 802, 93 S.Ct. at 1824, EEOC had the burden of proving, among other elements, that Zettie Smith applied for the job and was rejected. In my opinion, it did not carry that burden. If one accepts that EEOC even made out a prima facie case, Ford presented enough evidence "to articulate some legitimate non-discriminatory reason for the employee's rejection," id., to-wit, that it did not know she was applying for a job in the warehouse. Recent cases such as Furnco Construction Co. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), and Board of Trustees of Keene State College v. Sweeney, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), make clear that the burden on the employer of articulating such a reason is not very heavy. The ultimate burden of persuasion remains on the employee, and thus, the employer need only articulate such a reason, Furnco, supra, 438 U.S. at 576-78, 98 S.Ct. at 2949-50, that is, " 'explains what he had done' or 'produce(s) evidence of legitimate nondiscriminatory reasons,' " Sweeney, supra, 439 U.S. at 25, n.2, 99 S.Ct. at 297, n.2, which the Court has found to have a "significant distinction" from requiring the employer to prove the absence of a discriminatory motive, id., at 25, 99 S.Ct. at 297. See also Loeb v. Textron, Inc., 600 F.2d 1003, 1011-12 (1st Cir. 1979) (Sweeney makes clear that the burden on the employer is not to persuade but only to produce evidence of a legitimate reason, which then shifts the burden back onto the employee to show the reason is merely a pretext for discrimination); See also Wright v. National Archives & Records Service, 609 F.2d 702, 714 n.13 (4th Cir. 1979) (en banc).
 
 
 175
 Smith's own testimony lends support to that explanation of why she was not given a warehouse job in 1971 she did not make it at all clear to Ford that she was seeking a job in the warehouse. Smith testified before the district judge as follows (App. 689-90):
 
 
 176
 "Q. Did you indicate in, on each occasion that you were applying for work in the Ford warehouse or what did you tell them?"A. I didn't indicate what job I applied for, I just, unless it was something in my line of work or whatever."
 
 
 177
 Her prior work was in filling orders in a stockroom; although similar to the picker-packer job she claims she was illegally denied, it is not the same job, and therefore, she did not unambiguously indicate what job she was seeking. In addition, it is not even clear from her testimony that she is certain she told Ford she wanted work similar to what she was then performing or, if she did, that she described her then job sufficiently for Ford to understand what employment she wanted. If she made out a prima facie case that she applied, was qualified, and yet was rejected Ford has rebutted that by articulating a legitimate nondiscriminatory reason explaining why it did not hire her: It did not know she had applied for a warehouse job. Given the ambiguity of her own testimony, Ford's explanation is persuasive and carried its burden, admittedly a light one. Certainly, she failed completely to show that Ford's reason was a mere pretext for intentional discrimination, a charge she made no attempt to prove.
 
 
 178
 Because of Ford's surprise at Smith's testimony that she first applied for employment in 1971 and indeed to the surprise of EEOC I would at least remand this phase of the case for a further hearing on that issue to allow Ford an opportunity to present further evidence for its position that she did not apply for a warehouse job prior to March, 1973. In sum, the action of the District Court in denying Ford's motion to amend the findings by permitting additional evidence was reversible error.
 
 Seven Women
 Liability
 
 179
 I agree that the evidence warranted a finding that Ford discriminated against seven women eight if Smith is added when it hired Simpson in July, 1973. Under Ford's "buddy system," applications were considered current for only six months, a practice about which applicants were not told, and employees were allowed to update friends' applications as well as recommend them. Simpson testified he asked a friend numerous times to "bird-dog" his application, and the friend apparently updated it for him. The Special Master determined that Ford gave him the job at least in part to accommodate his friend. Such practices, common at Ford, were its "standard operating procedure," Teamsters v. United States, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977).
 
 
 180
 Practices similar to updating and bird-dogging applications have been condemned by this Court. "Word-of-mouth hiring, which the district court found to be (the employer's) primary method of recruiting new over-the-road drivers, is discriminatory because of its tendency to perpetuate the all-white composition of a work force." Barnett v. W. T. Grant Co., 518 F.2d 543, 549 (4th Cir. 1975). In addition, the use of subjective criteria, such as recommendations of employees, has been criticized: "Nonobjective hiring standards are always suspect because of their capacity for masking racial basis (sic)." Id. at 550. See also Weiner v. County, supra, at 382, ("The use of employee preferences in making hiring decisions is questionable when all employees are male and there is no affirmative action program ...."). Here, as in W. T. Grant Co., the statistics alone, though persuasive, may not have been enough to make out a case of discrimination.[9] W. T. Grant Co., supra, at 549. The majority concedes that "E.E.O.C.'s case is less than totally convincing because Ford made only one contested employee decision between 1971 and 1973."[10] Nevertheless, the net result here is the same as in W. T. Grant Co. no black supervisors or over-the-road drivers in W. T. Grant Co., and no women permanent employees in Ford's warehouse until 1975 and the similar discriminatory practices of word-of-mouth hiring and subjective criteria strengthen both statistical cases, as the majority correctly pointed out. This court has explained, "In addition to statistics, a court must also examine 'patterns, practices and general policies to ascertain whether racial discrimination exists'." W. T. Grant Co., supra, at 549. In my opinion, Ford's discriminatory practices and the total exclusion of women from the warehouse until 1975 made out a prima facie case of discrimination in hiring Simpson.
 
 
 181
 The court rejected Ford's rebuttal evidence that it had a legitimate, nondiscriminatory reason for hiring Simpson: Ford claimed he was more qualified than the women it did not consider. As discussed earlier in relation to the 1971 discrimination against Gaddis and Starr, recent Supreme Court cases have made it clear that this burden on the employer is light; he need only articulate such a reason or explain his reasons for not hiring the alleged victims of discrimination. Nevertheless, no matter how light the burden of showing a nondiscriminatory reason, the lower court's rejection of Ford's rebuttal argument that Simpson was more qualified was not clearly erroneous. The employment records of several of the women were almost identical to that of Simpson.
 
 
 182
 The Special Master found that Ford's action in hiring Simpson "was not motivated by an intent to discriminate." App. 236. This finding would prevent the EEOC from arguing that the reason Ford gave for hiring Simpson was a mere pretext for discrimination.[11] In New York City Transit Authority v. Beazer, 440 U.S. 568, 587, 99 S.Ct. 1355, 1366, 59 L.Ed.2d 587 (1979), the Court wrote, "The District Court's express finding that the rule was not motivated by racial animus forecloses any claim in rebuttal that it was merely a pretext for intentional discrimination." However, the burden only shifts back to the plaintiff, EEOC, to prove pretext if Ford successfully rebutted the inference of discrimination raised by the EEOC. If Ford did not rebut the prima facie case successfully, there is no need to reach the stage of proving pretext, a proof EEOC admittedly would have been barred from making by the Special Master's finding.
 
 
 183
 Back Pay: Actual or Hypothetical Work Record
 
 
 184
 The discrimination by Ford in hiring Simpson only resulted in the denial of one vacancy to all the women applicants. Seven women appeared before the Special Master and established that they applied and were qualified for the job. I agree with the decision at the lower level to divide one award among the seven, although I would add Zettie Smith and divide it eight ways if she were determined on remand not to have been discriminated against in 1971. I disagree, however, with the method used to measure the size of that award.
 
 
 185
 Title VII cases use two measures for damages, although I can find no case explicitly setting out how and when each is used. Implicit in most cases, nevertheless, is that two lines of employment progress are traced to determine what the victim would have earned "but for" the discrimination, and damages are cut off if either ends: first, the length of service on the job with defendant company of the successful applicant and second, the availability for employment of the victim of discrimination who was illegally denied that job. See, e. g., White v. Carolina Paperboard Corp., 564 F.2d 1073, 1084-1089 (4th Cir. 1977). To see how long the victim would have lasted in the job, the successful applicant's service with defendant company is measured. If he is laid off and not recalled, at that point, the job that was denied the victim no longer exists and the victim's compensation ends, even if the victim was still available for hire. The records of all victims denied jobs also are examined to see if they were always available for hire; if not, back pay is cut off even if the successful applicant is still on the job.[12] As the majority here points out, courts at times must hypothesize a work record to determine how long a victim would have worked "but for" the discrimination practiced against him, but it fails to point out that where such hypothesis is required is in class-action suits involving large-scale denial of jobs or promotions or transfers over a long-period, E. g., United Transportation Union, supra, at 341 (Winter, J.), and Hairston, supra, at 232-33 (Winter, J.). In such cases, a specific individual who took each victim's opportunity cannot always be identified so that his work record can be followed, which forces the court to come up with a hypothesis as how long each victim would have continued with the company had he been hired or promoted. Such a hypothetical employment history is unnecessary to remedy individual instances of discrimination, as in this case where the identity and work record of the actual successful applicant is known. Even in a class-action suit with numerous claimants, this court overturned an award by Judge McMillan because he resorted to an average or hypothetical difference between earnings by blacks and whites during the critical period rather than determining each award on the individual facts. Carolina Paperboard, supra. For example, if one of the victims would have been qualified to progress to a tender's job by 1968, when another person was hired for the job, this circuit said he was to receive the difference between his own low wage and a tender's wage, up to 1975 "(a)ssuming the tender hired in 1968 remained in the job until 1975...." Id. at 1085. (emphasis supplied). A court is then to use the successful applicant's actual work record, ending back pay for the discriminatee when the job holder leaves the company's employ.
 
 
 186
 The lower court used that actual record here, that of Simpson, the successful applicant, but departed from it when he was laid off, at which time the victims' back pay would have ceased. At that point, the court switched to a hypothetical record, arguing that, had one of the victims been hired instead of Simpson, she would have been recalled in 1975, even though Simpson was not. The facts are that, after Simpson's layoff Ford had no vacant slot until 1975, after Simpson's recall rights had expired, when it hired Doris Baumgardner, a female. The court said it based its surmise that a victim would have been recalled on evidence that Ford's custom was to rehire former employees even after they lost their recall rights. That surmise is, in fact, contrary to the evidence. The only pertinent proof was the testimony of Ford's former warehouse manager that no such custom existed: "Sometimes we do and sometimes we don't. It depends. I would say the majority of the times, we did recall them." App. at 1041. The witness then stated that it would depend upon the performance of the employee and other factors such as the desire to return to Ford and, if the employee is leaving another job, whether there is a reasonable likelihood that the job with Ford would be permanent which assurance Ford could not give. Id. at 1042.
 
 
 187
 In an analogous case the Second Circuit rejected a back pay award under NLRA that involved less surmise than here. The Board in N.L.R.B. v. R.K. Baking Corp., 273 F.2d 407 (2d Cir. 1959), cert. denied, 363 U.S. 804, 80 S.Ct. 1239, 4 L.Ed.2d 1148 (1960), followed the successful applicant's actual case history to determine how long the victim would have continued in the company's employ. The discriminatee was illegally denied a temporary job and one Greenberg was hired. After Greenberg's temporary job ended, he was actually given the next permanent vacancy "on the basis of prior employment by R.K. as a temporary relief man", id. at 410. The Board assumed that the discriminatee would also have gotten that permanent job opening had he, instead of Greenberg, been awarded the temporary job. The Second Circuit rejected this reasoning because the company was not required to hire Greenberg but simply decided to do so voluntarily: "(A)bsent evidence of a seniority system enforceable by ex-employees, whether (the victim), but for the refusal of the temporary job ... would have been subsequently employed by R. K., still remains a matter only of conjecture." Id. at 411 (emphasis supplied).
 
 
 188
 The lower court here used even more invention. The Board, in R. K. Baking Corp., had taken the company's actual treatment of the successful applicant and assumed that the victim would have fared as well, whereas the district judge here rejected what actually happened to Simpson, assuming that the company would have acted differently toward the victims. The Board's assumption that the company would have treated the victim the same as it actually treated the successful applicant was far less of a departure from the given facts than was made by the lower court here, yet the Second Circuit rejected it, saying, "(T) his appointment, so far as the evidence shows, was due only to the fortuitous circumstance that he was available and qualified not because of any rights of seniority entitling him to the job ... (T)he respondent employer was entitled to fill the position by anyone it chose whether theretofore employed or not." Id. at 411 (emphasis supplied).
 
 
 189
 This court, should reverse the award as pure fantasy opposed to the given facts, for the same reasons stated by the Second Circuit: "(T)he evidence fails to show that these drastic remedies as applied in favor of this complainant, who never was an employee of the respondent are necessary to make him whole for the discrimination practiced against him in refusing employment." Id. at 410. Simpson's actual work history should not be ignored: Back pay should be ended on August 6, 1975, when his recall rights ended, or, at the latest, on September 22, 1975, when Doris Baumgardner was hired.
 
 Additional Remedy
 
 190
 The usual remedy for victims of Title VII discrimination includes reinstatement, but I do not see it as an abuse of discretion for the lower court to have denied that relief here and would not remand for reconsideration which, in effect, will compel the lower court to order reinstatement and additional back pay. Gaddis and Starr, in my opinion, have already turned down valid job offers for Ford, and there is no reason to continue to penalize Ford with back pay until it makes the fruitless gesture of offering the same jobs to the women for the second time. To order Ford to make offers to the seven or eight, if Smith is added victims of discrimination in 1973 as jobs become available is too heavy a burden to put on Ford especially in light of its recent affirmative action efforts.[13] To tie Ford's hands so that it cannot make its own selections of employees for the next seven or eight openings, perhaps dragging out for years, seems too harsh a remedy for one discriminatory act, not even an intentionally discriminatory one. Although the District Court's discretion in fashioning a remedy in a Title VII violation is not "unfettered by meaningful standards or shielded from thorough appellate review," that remedy is left in the first instance to the district court. Albemarle, supra, 422 U.S. at 416, 95 S.Ct. at 2371. I believe that valid reasons exist for denying reinstatement, that the District Court did not abuse its discretion in not so ordering, and I therefore would not remand for the lower court to articulate the reasons for its denial, as such will almost inevitably make the court feel pressured to order reinstatement and grant additional back pay.
 
 Conclusion
 
 191
 In summary, I would uphold all findings of discrimination except that pertaining to Zettie Smith in 1971, which I would either reverse as clearly erroneous or remand for further fact finding as to the 1971 applications. I would uphold the grants of back pay to each, although adding Smith to the group sharing the award for the 1973 violation, but I would end the award to each with the victim's accepting permanent employment, removal from the job market, refusal of a valid job offer by Ford, or with the successful applicant's loss of the disputed job with Ford. I would not remand for the District Court to reconsider whether to offer reinstatement and continue back pay indefinitely.
 
 
 192
 If the District Court's decision not to order Ford to offer employment to the ten women involved here is upheld, it follows that there is no need to extend their back pay until the women are given an opportunity to accept or reject such offers. As noted earlier, if on remand the court reconsidered under the pressure of the majority's opinion and prolonged back pay, Gaddis, Starr, and Smith would collect over three years' extra back pay and over three years' worth of salary would be added to the seven womens' joint award, increasing Ford's liability by perhaps $100,000 beyond the already overly generous grant the District Court felt was appropriate. The award would be out of all proportion to the discriminatory acts committed by Ford.
 
 
 193
 I respectfully dissent.
 
 
 
 *
 Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 Ford filled four positions with men in August, 1971. One of those positions was created especially for a man, Parks, who transferred from a Ford warehouse in another city. The district court instructed the special master to base the back pay periods of the three women on the employment histories of Blanchard, Coe, and Rogers, the three men hired to fill the other three positions in which vacancies had occurred in the regular course of operations
 
 
 [2]
 The seven women were Gloria Gaither, Betty Erwin, Mary Luckey, Frances McGinnis Gantz, Mary Cox, Arlene Brown, and Frankie Benson Grier. Because Mary Luckey had died in the interim, a representative of her estate appeared before the special master
 
 
 [3]
 Ford also suggests that Blanchard and Coe were more qualified than Gaddis and Starr. Gaddis and Starr had worked as full-time parts pickers at a General Motors parts warehouse. Blanchard had worked for a chain saw manufacturer in a position similar to a picker-packer, and Coe had worked for a Ford dealership. However, both Blanchard and Coe had recently been high school students and had worked only part-time and during the summers. The district court found that Gaddis and Starr were qualified to work for Ford as picker-packers, and on this record it is certainly not clear that Blanchard and Coe were more qualified
 Moreover, the gravamen of the EEOC complaint is that Gaddis and Starr were not considered for the openings, even though they were qualified, merely because they were women. Ford can hardly defend itself on the basis of relative qualifications when it never evaluated the qualifications of the women.
 
 
 [4]
 Ford claims that it was surprised by Smith's testimony that she had applied in 1971. Smith testified as one of the women who applied in 1973, but mentioned during her testimony that she had applied in 1971. Ford requests a remand so that the district court can conduct a further hearing into Smith's claim
 As explained above, the determination of when Smith first applied was purely a credibility determination. Smith said she applied in 1971. Ford's personnel stated that Gaddis and Starr were the first women to apply for warehouse jobs. Thus, the basic question was whether Smith's story was believable in the face of contrary testimony.
 The district court heard Smith's testimony and the testimony of Ford's employees. Ford had ample opportunity to cross-examine Smith. The district court concluded that Smith was telling the truth and that under Ford's employment practices her application was not seriously considered because of her sex. We see no need for further proceedings, since the district court has heard and evaluated the pertinent evidence.
 Ford makes one last argument for a remand by contending that Smith stated that she did not specifically request a picker-packer job when she applied at the warehouse. As Ford points out, during her testimony Smith stated, "I didn't indicate what job I applied for." But, as Ford fails to mention, Smith immediately continued, "I just, unless it was something in my line of work or whatever." Ford's attorney then asked, "Your line of work was what?" Smith replied, "Stockroom or shipping or something like that."
 Smith's testimony is not a model of clarity. But she indicated that she applied for a job in her line of work, which was stockroom or shipping work. The job at the warehouse which obviously fitted to her description was the picker-packer job. The district judge, who heard Smith's testimony and observed her demeanor during cross-examination, found that she applied for a warehouse job. Based on Smith's testimony, which Ford itself developed on cross-examination, that finding is not clearly erroneous. Here, again, there is no need for a remand.
 
 
 [5]
 Ford argues that the district court placed an impermissibly heavy burden upon it. According to Ford, the district court required it to "establish" or prove that it had not discriminated against the three women. Keene State, Ford contends, requires only that it "articulate" a legitimate nondiscriminatory reason for choosing the men instead of Gaddis, Starr, and White
 In this case, Ford neither "articulated" nor "established" a legitimate nondiscriminatory reason for hiring the men, since the district court found that the facts did not coincide with Ford's representations. Ford insisted that the other women had not applied when the men were hired. The district court determined the truth to be that the women had applied beforehand. In this situation, Ford was left with no defense to the prima facie case of discrimination.
 
 
 [6]
 Ford submits that this focus on the work histories of the men who were actually hired is punitive. But the best evidence of the female applicants' probable work histories at Ford was the work histories of the men who held the 1971 positions. By constructing the hypothetical work histories of the women through reliance on the work histories of the men, the district court acted only to compensate the discrimination victims, not to punish Ford
 
 
 [7]
 See note 11, infra
 Furthermore, the back pay formula employed by the district court in this case is the back pay formula used under the NLRA. The Board estimates the back pay the discrimination victim would have earned but for the discrimination and subtracts actual earnings to determine the back pay award. NLRB v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); F. W. Woolworth Co., 90 NLRB 289 (1950).
 We also note that the NLRB decisions cited by Ford are inapposite to this case. In Circle Bindery, Inc., 232 NLRB 1185, 1187-88 (1977), the Board terminated the back pay period when the discrimination victim accepted permanent employment, but because the discrimination victim would have left the temporary job from which he had been discriminatorily discharged when he accepted the permanent job. Thus, the acceptance of the permanent job marked the end of his hypothetical work history for the temporary employer. In Star Baby Co., 140 NLRB 678, 683-84 (1963), the Board ended the back pay periods when the discrimination victims found permanent employment, but did not address the problem faced in the instant case. Star Baby was complicated by the fact that the employer had gone out of business.
 
 
 [8]
 Of course, if a discrimination victim accepts permanent employment with substantially equivalent wages and remains at that job, the back pay period would end when she accepted the permanent job, because thereafter she would suffer no damages. Her actual earnings from that point on would be equal to or more than what she would have earned if she had not been a victim of discrimination. See Butta v. Anne Arundel County, 473 F.Supp. 83, 89 (D.Md.1979); Milton v. Bell Laboratories, Inc., 428 F.Supp. 502, 515 & n. 19 (D.N.J.1977). In this case, however, Gaddis and Starr were unable to remain at General Motors, because they were once again laid off after working for about a year. They thus suffered additional damages during the period following their layoff from General Motors, a period when they would probably have been employed if Ford had not discriminated against them in 1971
 
 
 [9]
 Ford points to several NLRA decisions in which the NLRB has held that an offer of reinstatement terminates an employer's back pay liability to a discriminatorily discharged employee. E. g., D'Armigene, Inc., 148 NLRB 2 (1964), enf'd as modified, 353 F.2d 406 (2 Cir. 1965). For several reasons we do not find these decisions persuasive
 The decisions cited by Ford discuss offers of reinstatement. In the instant case, Ford did not make the women offers of reinstatement, but only offers of beginning employment. An offer of reinstatement carries with it seniority rights, whereas an offer of beginning employment includes no seniority rights. This failure of Ford to offer retroactive seniority prevents Ford from relying on its offers to Gaddis and Starr.
 In fact, our decision in this case is consistent with at least one decision of the NLRB. See note 11 infra. In NLRB v. Hilton Mobile Homes, 387 F.2d 7 (8 Cir. 1967), the employer offered a discharged employee reinstatement, but without seniority rights. The Board held that this offer did not terminate the company's back pay liability because the offer did not include seniority. The court agreed and enforced the Board's order. The offer in the instant case is almost identical to the offer in Hilton Mobile Homes, but significantly different from the offer of reinstatement addressed in D'Armigene.
 Also, Gaddis and Starr mitigated damages. In some situations, refusal of an offer of employment or reinstatement might amount to a failure to mitigate damages, and, under 42 U.S.C. § 2000e-5(g), the discrimination victim's recovery might be reduced by the amount of wages she could have earned in the offered job, as "amounts earnable with reasonable diligence." In the case of Gaddis and Starr, they reduced Ford's liability by continuing to work at General Motors.
 
 
 [10]
 In addition to its finding that the women did not want to lose their General Motors seniority, the district court found that neither Gaddis nor Starr wanted to be the only woman employed at the warehouse. In fact, Ford's warehouse manager testified that he warned Gaddis and Starr that they might be subject to sexual harassment if they worked at the warehouse. He told them that "they may very well (be) subjected to passes, offensive remarks, off-color language" and that "there are not now nor, ... have there ever been women working in the warehouse."
 Incredibly, Ford tries to rely upon the discriminatory atmosphere of the warehouse to argue that Gaddis and Starr unreasonably rejected Ford's job offers. It would be ironic indeed if Ford could defeat the remedial purposes of Title VII by resting upon sexual harassment of women in its warehouse. Ford cannot escape the fact that its offer included no seniority rights to make Gaddis and Starr whole.
 We note further that the warehouse manager told Gaddis and Starr that if Ford hired one of them, it would hire the other to avoid subjecting a lone woman to sexual harassment. In 1973, Ford offered a single position to each of the women. It did not offer positions to both.
 
 
 [11]
 This decision is particularly persuasive, because Congress turned to the "make whole" provisions of the NLRA when it framed the relief provisions of Title VII. Albemarle Paper Co., 422 U.S. at 419-22, 95 S.Ct. at 2372-73
 
 
 [12]
 Our description in Wright, 609 F.2d at 711, of the disparate impact theory is directly applicable to the path Ford followed to fill its 1973 vacancy:
 Central to proof of a prima facie case under this theory is proof of an employment policy or practice which, though facially neutral or even benign in actual purpose, nevertheless imposes a substantially disproportionate burden upon a claimant's protected group as compared to a favored group within the total set of persons to whom it is applied.
 
 
 [13]
 Simpson had worked for about three years as a material handler at a printing company. Of the eleven women, four had worked in warehouses for at least two years, including two who had worked in auto parts warehouses; one had worked for over five years as a distribution clerk in a post office; two had worked in textile mills; and one had spent nine years as an assistant manager of a drive-in
 Further, it should be noted that the district court found: "Although Ford contends that similar past experience is an important factor, the speed with which a new employee is expected to learn and usually does learn how to perform his job demonstrates that such past experience is not an essential job qualification."
 
 
 [1]
 Throughout this dissent, the woman known as Zettie Smith is treated as having been discriminated against in 1971, as the District Court found with the majority concurring. It is my view that Smith was not the subject of discrimination until 1973 and, if correct, Smith should be added to the other seven women and allowed a one-eighth interest in the combined award made for the benefit of the seven women
 
 
 [2]
 It was generally conceded by all that the applications of Gaddis and Starr, received on July 21, 1971, were the first female applications received by Ford for employment in the warehouse. Their applications were readily discovered by the EEOC during its investigation, but the alleged 1971 written applications of Zettie Smith, supposed to be prior to the Gaddis and Starr applications, were never located
 
 
 [3]
 Coe did not begin work until on or after August 2. Blanchard, who began on August 5, was asked how long after he filed his application he was called to work and answered a week or two. Since he applied on May 18, the district judge apparently believed Blanchard understood the question to be how long before he began work on August 5 was he notified to report to work. Blanchard answered: "I don't remember as far as how long before, you know, a week or two weeks." (Emphasis supplied). The receptionist testified that the third man hired, Rogers, applied "pretty close to the same date that the girls (Gaddis and Starr) came in." Even if we were to assume the correctness of Ford's contention, the record adequately demonstrates that Ford did not believe that women should work in the warehouse
 
 
 [4]
 The date of Starr's termination of employment by General Motors is uncertain. The Special Master reported that it was "sometime in 1974." However, Gaddis testified that she and Starr had exactly the same periods of employment by GM (App. 587). When GM closed its Charlotte plant in 1974 and moved to Atlanta, both Gaddis and Starr rejected GM's offers of employment in Atlanta. I do not contend, however, that their refusal to accept employment in Atlanta terminated their right to back pay unless it had been previously terminated for other reasons
 
 
 [5]
 Gaddis testified at trial that she refused the offer because she was reluctant to leave her "good seniority with General Motors and I had a secure job." Both testified they were concerned because they did not know exactly what job they would perform in the warehouse. Gaddis said she preferred working under less stress and pressure at GM, and both said they did not wish to be the only woman working in the Ford warehouse. Massey, who made the offer for Ford, testified that Gaddis expressed concern when the offer was made as to the lack of regular hours, Ford's motive in making her the offer when she had an EEOC claim pending against them, and whether Starr would also be hired so that she would not have to be the only woman in the warehouse. The latter reason was her primary concern at the time she refused Ford. According to Massey, Starr was being offered the job after Gaddis turned it down, and expressed the same concern to him about being the only woman in the warehouse
 
 
 [6]
 The Third Circuit's holding in Jurinko v. Edwin L. Wiegand Co., 477 F.2d 1038 (1973), which was relied upon by the majority, was vacated and remanded by the Supreme Court, and this is not reliable precedent. That circuit had held that an offer of employment to an applicant illegally refused a job was invalid if it failed to include back pay or seniority rights. Id. at 1047. That entire decision was vacated and remanded by the Supreme Court, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1974), to be reconsidered in light of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). McDonnell Douglas sheds no light on the issue, as it does not deal with back pay or seniority rights. The Third Circuit later remanded the case for a second time, saying "It is true that when this case was first here we held that the plaintiffs should also recover for loss of earnings after they rejected that (offer without seniority or back pay) and until Weigand should reemploy them with seniority and back pay. But when the Supreme Court reviewed our decision and remanded the case to us, it expressly vacated our ruling on damages." 528 F.2d 1214, 1216 (3d Cir. 1975). The District Court was then told to reconsider the damages issue in light of McDonnell Douglas and Albemarle, supra. As no further proceedings are reported, the case has no precedential value as to the need to offer seniority rights to its new employees. Moreover, Jurinko dealt with former discharged employees, as did Sprogis v. United Air Lines, 444 F.2d 1194 (7th Cir.), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971), the only authority relied upon by Jurinko. Indeed, the majority opinion here in footnote 9, p. 193, specifically states that "An offer of reinstatement carries with it seniority rights, whereas an offer of beginning employment includes no seniority rights."
 
 
 [7]
 Gaddis testified (App. 579) before the court:
 "Q. Has there been any time when you have stopped seeking employment?
 "A. Yes, sir, when I started to school on a full-time basis in 1975."
 Before the Special Master, Gaddis was asked (App. 1114):
 "Q. Ms. Gaddis, during the period September, 1975, while you were in the SETA (sic) training program, were you still available for work?
 "A. Yes, sir, I suppose you could say I was."
 And later (App. 1119):
 "Q. If you had been offered a job during that period by Ford Motor Company, would you have taken the job?
 "A. Well, since I wasn't offered, it's hard to say. I certainly would have given it great consideration."
 As to Starr, the only testimony on the subject was before the Special Master (App. 1159):
 "Q. While you were in that SETA (sic) training program, Ms. Star (sic), were you still available for work?
 "A. Yes, sir."
 "Q. If you had been offered a job at the Ford Motor Company in 1975 would you have considered that offer?
 "A. I would have considered it."
 
 
 [8]
 Excellent discussions of the various decisions and the reasons pro and con are contained in E. E. O. C. v. Sandia Corp., 639 F.2d 600 (10th Cir. 1980) (upholding decision not to deduct unemployment payments from age-discrimination back pay awards under another Act) and E. E. O. C. v. Enterprise Association Steamfitters, Local 638, 542 F.2d 579, 591-92 (2d Cir. 1967), cert. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977) (not an abuse of discretion for lower court to deduct public assistance payments from Title VII)
 
 
 [9]
 "Statistics can in appropriate cases establish a prima facie case of discrimination, without the necessity of showing specific instances of overt discrimination." W. T. Grant Co., supra, at 549. However, those statistics must be large enough to stand alone. "Considerations such as small sample size may, of course, detract from the value of such evidence," Teamsters, supra, 431 U.S. at 340, n.20, 97 S.Ct. at 1856, n.20. An employer can defend against a case establishing a pattern or practice by showing "that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination." Id. at 360, 97 S.Ct. at 1867
 
 
 [10]
 Ford says it filled only three slots from 1972 to 1975 and one was offered to Gaddis and Starr, whereas EEOC sees Ford as having received applications from thirteen qualified women, none of whom were interviewed when the males, who were interviewed, were hired to fill all the openings up until 1975
 
 
 [11]
 The Special Master's finding that Ford did not intend to discriminate in my opinion would also prevent the EEOC from successfully proving discrimination in 1973 using a theory of disparate treatment under McDonnell Douglas, supra, 411 U.S. at 802, 93 S.Ct. at 1824. My greatest problem with finding discrimination by Ford in 1973 is an inability to determine which theory was used, disparate impact or disparate treatment. See Teamsters, supra, 431 U.S. at 335-36 n.15, 97 S.Ct. at 1854 n.15, See also Wright, supra, at 712-15. The Special Master interpreted the District Court's finding of discrimination in 1973 to be based at least in part on a pattern or practice of discrimination, App. 236, 285-86, but those words can be used to establish discrimination under either theory. Teamsters, supra, at 335-36 n.15, 97 S.Ct. at 1854 n.15. "Either theory may, of course, be applied to a particular set of facts," id. at 336 n.15, 97 S.Ct. at 1854 n.15; both can be argued in the same suit, Furnco, supra, 438 U.S. at 582, 98 S.Ct. at 2952, and they can be pleaded as alternative theories of discrimination, Wright, supra, at 711
 The language used by the Special Master, District Court, and majority here all point to disparate treatment as the theory applied here. For example, the prima facie case the EEOC made out was clearly based on McDonnell Douglas, supra, 411 U.S. at 802, 93 S.Ct. at 1824: the women were shown to have applied, been qualified, yet not considered, and the job was kept open for others no more qualified than they were. Ford's rebuttal evidence that was rejected sought to articulate a legitimate nondiscriminatory reason for hiring Simpson. I have my doubts that such a case of disparate treatment can be made out, however, where the Court specifically finds no intent to discriminate. "Proof of discriminatory motive is critical (to proof of disparate treatment under McDonnell Douglas ) although it can in some situations be inferred from the mere fact of differences in treatment." Teamsters, supra, 431 U.S. at 335 n.15, 97 S.Ct. at 1854 n.15. Direct proof of discriminatory motive is unnecessary if an inference is raised, but once a specific finding of no intent to discriminate is made, that inference is negated. The District Court could have inferred discriminatory intent from Ford's failure to interview the women, but, once the Special Master found Ford did not intend to discriminate, that inference of discriminatory motive was dispelled. "A prima facie case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained are more likely than not based on the consideration of impermissible factors." Furnco, supra, 438 U.S. at 577, 98 S.Ct. at 2949. I do believe, however, that EEOC's statistical showing of disparate impact on women of Ford's policy, as evidenced by their total exclusion from the warehouse until 1975, combined with Ford's practices of using subjective criteria and allowing employees to update applications and recommend applicants made out a case of discriminatory impact, one very similar to that found by this Court in W. T. Grant Co., supra, at 549-50.
 
 
 [12]
 In N.L.R.B. v. Local No. 2 of United Ass'n of J. & A. of P. & P. I., 360 F.2d 428, 434 (2nd Cir. 1966), the court ordered the Board to determine, before awarding back pay "the length of time (the employer) would have kept the four (applicants) at work" had they been hired, which in part depended on their ability to do the work and in general on "their employability, since they were never put to work." Only actual losses should be made up since "back pay is not a punitory award for having been the victim...., it rests on the right to have had the work and presupposes the ability to do it." Id. Inquiry should be made into how long the applicants, "on the basis of their ability and other factors would have been kept at work by" the employer. Id. (emphasis supplied). The Special Master in this case looked into whether each woman's qualifications were sufficient to be considered for the job, but he did not attempt to determine how long each would have kept the job, based on her abilities, had she been hired instead of Simpson, or whether each woman's performance would have been good enough to have been rehired, unlike Simpson, even after her recall rights had expired. See Ford warehouse manager's testimony on recall, infra, at 196
 
 
 [13]
 Since this litigation arose, and even prior thereto, Ford has had an affirmative action program. True, it may not have been effective when this litigation arose, but it has been made effective since that date. For example, the last six warehouse jobs, filled since 1975, have gone to four women and two black males. A recent class-action case has been settled by Ford paying a very substantial sum for the benefit of the class. I have no knowledge as to whether the present claimants are included in, or excluded from, the class